

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00021-CV

| | | |
|---|---|---|
| In the Interest of C.D.E., C.V.E., and S.D.E., Children | § | From the 323rd District Court |
| | § | of Tarrant County (323-94230J-11) |
| | § | December 21, 2012 |
| | § | Opinion by Justice Walker |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in part of the trial court's judgment. It is ordered that the judgment of the trial court is affirmed in part and reversed and rendered in part. We affirm that portion of the trial court's judgment that appoints the Department as the managing conservator of C.D.E., C.V.E., and S.D.E. We reverse that portion of the trial court's judgment that terminates Father's parental rights to C.D.E., C.V.E., and S.D.E. and render judgment denying the Department's petition to terminate Father's parental rights to C.D.E., C.V.E., and S.D.E.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00021-CV

IN THE INTEREST OF C.D.E.,
C.V.E., AND S.D.E., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

Following a bench trial, the trial court signed an order terminating Appellant

Father's parental rights to his three daughters, C.D.E., C.V.E., and S.D.E.[1]  In

four issues on appeal, Father argues that the evidence is legally and factually

insufficient to support the trial court's findings that grounds for termination of his

---

[1]In accordance with Texas Rule of Appellate Procedure 9.8(b)(2), the opinion will refer to the children using the following aliases: C.D.E. will be referred to as Claire, C.V.E. will be referred to as Chelsea, and S.D.E. will be referred to as Stephanie.

2

parental rights existed under Texas Family Code section 161.001(1)(D), (E), (L), and (Q). For the reasons set forth below, we will affirm in part and reverse and render in part.

## II. Factual and Procedural Background[2]

The record reveals that Father was a good provider for his family and a good parent to his daughters. Father supported his family as a commercial truck driver. Father's mother testified that he had more contact and more interaction with his daughters than Mother.

In 2002, two years after Father's youngest daughter Stephanie was born, Father was arrested for intoxication manslaughter after a driving accident in which a teenage boy and a teenage girl died. At the termination trial, Father admitted that on the day of the accident he had consumed a full bottle of Seagrams 7; prior to that day, according to Father, he had never consumed hard liquor and did not drink on a regular basis. Father did not believe that he was intoxicated at the time of the accident.[3] From the date of the accident in 2002 through the termination trial in late 2011, Father remained incarcerated; he ultimately received and was serving a thirty-year prison sentence.

---

[2]Because Father does not challenge the best interest finding, we do not include testimony from the trial pertinent to only that finding.

[3]Father testified that his conduct was accidental; "[i]t was not premeditated[,] and it wasn't foreseen." Father did agree, however, that his conduct was criminal.

After Father's imprisonment, Mother became the sole provider for the three children. Unbeknownst to Father, Mother also became a drug addict;[4] Mother frequently moved herself and the children to new living locations. The girls described the last home that they shared with Mother as a drug environment: it had needles on the floor, was dirty and cluttered, did not always have running water, did not have working toilets, and did not always have food.[5] After Mother had trouble keeping the electricity on, she voluntarily allowed the girls to stay with an aunt and uncle. The aunt and uncle, however, were ultimately unable to care for the girls, and they were placed in a group foster home.

Father's sister Crystal testified at the termination trial that she was notified in May or June 2009 that the girls had been placed in foster care. She took them to visit Father in prison once.[6] Crystal agreed that it had been very difficult for Father to significantly participate in his children's lives because of his

---

[4]Father testified that other than an attempted-but-failed phone conference while the termination case was pending, he had no communication with Mother for at least eight years prior to the termination trial. Father said that he did not know of Mother's drug addiction. The Department's questioning of Father about his knowledge of Mother's drug use is minimal; the Department asked whether Father had "ever known [Mother] to have a drug problem," to which Father answered "no." The Department did not ask Father any questions about any drug use by Mother during her marriage to Father. Nor did the Department produce any records showing any criminal-drug-use history by Mother.

[5]The Department did not question Father about the condition of the home when he lived with Mother.

[6]Crystal testified that Father is incarcerated in a prison that is a five-hour drive south.

4

incarceration. Crystal believed that Father would be incarcerated until the girls were close to adulthood, and she also believed that if Father were released from prison sooner, he would do what he could to care for his daughters.

Crystal did not believe that the girls (who were ten, thirteen, and fifteen at the time of the termination trial) should have to wait until Father's release from prison in order to be parented. But Crystal vacillated in her answers on what she believed was in the children's best interest. She believed that they should be given the opportunity to proceed in an environment that is conducive to their having healthy lives and that given all the circumstances that the girls had been through, they needed "more than just love and a roof over their head[s] and someone to take them to and from school. They need someone that can get them counseling . . . ." Crystal did not believe that Father could provide that and said that Father had not always shown that he was a responsible parent. Crystal believed that it would "increase their odds [to move on and to have successful and productive lives if] they have a stable home, stable family, and stable mental care as well as physical care and school involvement." She initially testified that adoption was the best option for the girls, even if that meant terminating Father's and Mother's parental rights, but she later testified that she wanted the girls to be allowed to contact their parents with a letter or phone call if a counselor believed that would be beneficial to them in providing closure. Crystal did not believe that the girls' contact with Father should be 100% halted because Claire has a strong desire to continue a relationship with him and seeks it out. Crystal believed that

5

continued contact with Father would be in the children's best interest and also wanted Father to be allowed to maintain contact with his children. Crystal did not believe that the girls should be completely cut off from their family.

Father's mother testified that although Father could not provide financial support for his children while he was incarcerated, he could provide emotional and mental support and could be a good influence on his children. Father's mother believed that it was in the girls' best interest to move on with their lives and to have a permanent home. Father's mother agreed that Father's parental rights should be terminated if that is what it takes to implement what is in the girls' best interest. Father's mother also agreed that the best possible outcome for the girls would be for them to be adopted.

At the termination trial, Father was questioned about his criminal history. The documents offered into evidence by the Department show: Father pleaded guilty to the offense of burglary of a habitation (the offense occurred on February 22, 1991); Father was placed on deferred adjudication probation for the offense of burglary of a habitation; the State eventually filed a motion to proceed to an adjudication based on Father's failure to remain at the facility he was assigned to; at the adjudication hearing, the burglary-of-a-habitation offense was reduced to "criminal trespass-entry," a class A misdemeanor; and pursuant to a plea bargain at the adjudication hearing, Father was sentenced to ninety days'

6

confinement in the Tarrant County Jail.[7]  Thus, the Department proved that prior to Father's 2004 conviction for committing the offense of intoxication manslaughter on April 16, 2002, Father had one prior misdemeanor conviction for criminal trespass-entry.  The misdemeanor offense of criminal trespass was committed on February 22, 1991, before the birth of Father's first daughter.  Father denied any other convictions.  Father testified that he had also been arrested twice for domestic violence—once for violence against Mother and once for violence against a previous girlfriend.  Father said that the two charges were dismissed because he was the victim in those cases.

The record reveals ten instances of prior CPS history concerning the girls.  Nine of those referrals were against Mother or her paramour and were ruled out or were ruled "UTD."[8]  Eight of the referrals occurred after Father was incarcerated.  The one CPS referral that mentioned Father occurred in July 1999 when police found Claire wandering through an apartment complex by herself.  The case was ruled reason to believe for negligent supervision by Father.

---

[7]The Department's questioning of Father concerning these documents suggests that the Department thought Father had been convicted of multiple offenses on multiple dates.  But the Department offered into evidence only the documents showing a deferred adjudication on a burglary-of-a- habitation charge and a subsequent judgment adjudicating Father's guilt in that case for the plea-bargain-reduced offense of the class A misdemeanor offense of criminal trespass-entry.  And Father denied committing any other offenses.

[8]The term "UTD" is not defined in the record but presumably means "unable to determine."

Father testified that he had tried to maintain contact with his children during his approximately nine years in prison. Father said that he had written to different people in his family and to CPS and had told them that he wanted assistance in establishing a connection with his daughters. Father, however, did not recognize one of his daughters in a photo shown to Father during trial, and he was not aware that his daughters had been baptized the Sunday before the trial.

When Father was asked what efforts he had made while in prison to ensure that his girls were in a safe and protected environment, he testified that he had written letters to the girls at every address that he had been able to obtain for them and had asked if there was anything that they needed. He offered to help them overcome any emotional or mental obstacles that they were facing. Father said he wanted his daughters to have successful lives and to turn out better than he had. He testified that he could encourage them through letters to "do positive thinking and to take part in whatever life that they have." Father said that his daughters wrote back to him. The girls indicated that they enjoyed receiving Father's letters and wanted that contact to continue.

Father testified that he had no money and admitted that he had not provided financially for his daughters for the nine years that he had been in

prison. Father planned to provide for his children after his release[9] by renewing his commercial drivers' license. Father opined that upon his release, he had "multiple avenues of job resources" because in addition to his CDL, he had a diploma in paralegal studies and was a licensed cook.

Father believed that it would be beneficial for his daughters to have a permanent family. Father agreed that he could not provide his daughters with a stable living environment at the time of the trial because he was incarcerated. Father, however, did not believe his parental rights should be terminated; he wanted to maintain a relationship with his daughters.

Tyra Sasita, the conservatorship worker for the three girls, testified that Father had written Sasita throughout the case and had always expressed concern regarding his children. Sasita said that Father had tried to maintain contact with his daughters through correspondence.

Sasita provided an update on the three girls. Sasita said that when Stephanie came into care, she was behind in school and had been held back one grade. At the time of the termination trial, she was doing "very, very well" medically and was on target in the fourth grade. She is a happy-go-lucky girl who enjoys going to school and participating in activities at the foster home. She attended counseling weekly and used an herbal medicine to sleep at night.

---

[9]Father testified that he could be released on the day of the termination trial, and when asked if he anticipated that happening, Father said that he did not know the mind of TDC.

9

Chelsea had also been held back a grade. She was in the seventh grade at the time of the termination trial and was on target. She currently does not have any problems, is very outspoken, loves life, has lots of friends, and has a great personality.

Claire was also behind one grade and experienced some struggles with education in the beginning. At the time of the termination trial, she was in eighth grade and was doing very well. Initially, Claire was more reserved, but she had opened up, had made friends, and enjoyed spending time with her friends outside the foster home and going shopping and to the movies.

The Department asked the trial court to terminate both parents' rights to all three girls because it was in the children's best interest. The Department's plan was for the children to be adopted, but the Department did not have an adoptive placement for the children at the time of the termination trial.

The girls' preference was to stay at the group home where they were living because they liked their house parents. They did not want to consider adoption because, to them, that would mean that Mother's efforts to remain drug-free had failed.

After hearing the above testimony, the trial court found by clear and convincing evidence under family code section 161.001(1)(D), (E), (L), and (Q) of the family code that Father had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children (D), had engaged in conduct or had

knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children (E), had been convicted of one of the enumerated crimes under subsection (L) for being criminally responsible for the death or serious injury of a child, and had knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing of the petition (Q) and that termination of Father's parental rights was in the children's best interest under section 161.001(2). *See* Tex. Fam. Code Ann. § 161.001(1), (2) (West Supp. 2012). This appeal followed.

### III. BURDEN OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, No. 11-0282, 2012 WL 2617604, at *1 (Tex. July 6, 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

11

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 2012 WL 2617604, at *1 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could

12

reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573-74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

If we determine that no reasonable factfinder could form a firm belief or conviction that Father violated section 161.001(1)(D), (E), (L), or (Q), then the evidence is legally insufficient, and we must generally render judgment for the parent. *J.F.C.*, 96 S.W.3d at 266; *see* Tex. R. App. P. 43.3.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Father violated section 161.001(1)(D), (E), (L), or (Q). *See* Tex. Fam. Code Ann.

§ 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. NO EVIDENCE TO SUPPORT THE TRIAL COURT'S SECTION 161.001(1) FINDINGS

In his four issues, Father challenges each of the section 161.001(1) findings made by the trial court. We address each of the findings below.

### A. Section 161.001(1)(D) and (E)

In his first and second issues, Father argues that there is no evidence or insufficient evidence to support the trial court's endangering environment and endangering conduct findings under section 161.001(1)(D) and (E). Father argues that he has been in prison for the past nine years, so he did not knowingly place or knowingly allow the children to remain in an endangering environment and did not engage in endangering conduct nor knowingly place the children with others who did.

Under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. And there must be proof that the parent was aware of the potential for danger to the child in such an environment and disregarded that risk. *In re N.R.*, 101 S.W.3d 771, 775–76 (Tex. App.—Texarkana 2003, no pet.). In a suit to

14

involuntarily terminate the rights of an imprisoned parent under subsection (E), mere imprisonment will not, standing alone, constitute engaging in conduct that endangers the emotional or physical well-being of the children. *Boyd*, 727 S.W.2d at 533–34. However, if the evidence, including the imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the children, a finding of endangerment is supportable. *Id.* at 534; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (recognizing continuing criminal conduct and repeated incarceration may be part of a continuing course of conduct that is endangering under subsection (E)).

Here, no evidence exists that Father was aware of a potential for danger to the children in their environment or with their Mother and that Father disregarded that risk; Father testified that he did not know that Mother had a drug problem.[10] No evidence exists in the record that Mother did have a drug problem when Father was first incarcerated almost nine years before the termination trial. Although there is some evidence that Mother's home was a dangerous environment, the record is devoid of evidence tending to show that Father knew anything about the condition of Mother's home. Mother and the girls moved frequently and some of Father's letters to the girls were returned, showing that he

---

[10]Even if the trial court, as the trier of fact, chose to disbelieve Father's testimony as not credible, this does not prove that the opposite is true. *See Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 349 (Tex. App.—Houston [1st Dist.] 2007, no pet.). That is, disbelief of Father's testimony that he did not know does not, standing alone, prove that he did know.

did not know where Mother and the children were living, much less the conditions of their various homes. And because Father did not know about Mother's drug problem or the conditions of the various homes, there is no support in the record for the Department's argument that Father endangered the children by failing to alert the Department concerning the children's potential endangerment.

In support of the (D) ground for termination, the Department argues that Father's imprisonment exposed the children to an unstable lifestyle. But Father's incarceration alone is insufficient to support termination under subsection (D). *See Boyd*, 727 S.W.2d at 533–34. In support of both the (D) and (E) grounds for termination, the Department points to the children's CPS history and to Father's criminal history. Only one prior CPS referral involved Father, for neglectful supervision; all other CPS history referenced by the Department was "ruled out" or "ruled UTD." Father's only prior conviction was for a class A misdemeanor offense that occurred before the birth of his first daughter. These two pieces of evidence do not demonstrate a course of conduct by Father that endangered his daughters, which is required under subsection (E). *See In re E.N.C.*, No. 11-0713, 2012 WL 4840710, at *6 (Tex. Oct. 12, 2012) (recognizing that it is the Department's burden "to show the offense was part of a voluntary course of conduct" that endangered the children and holding evidence legally insufficient to support termination on subsection (E) grounds); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2000, no pet.) (stating that termination under subsection (E) must be based on more than a single act or omission; there must

be a course of conduct by the parent); *see also* Tex. Fam. Code Ann. § 161.001(1)(E).

Viewing the evidence in the light most favorable to the judgment, assuming that the trial court as the finder of fact resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, *see J.P.B.*, 180 S.W.3d at 573, no evidence exists that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being as required to authorize termination of his parental rights under section 161.001(1)(D). *See Walker v. Dep't of Family & Protective Servs.*, 251 S.W.3d 563, 566–67 (Tex. App.— Houston [1st Dist.] 2006, no pet.) (holding evidence legally insufficient to support termination of father's rights on (D) and (E) grounds because he was in jail at the time CPS investigated and removed the children from mother); *In re K.W.*, 138 S.W.3d 420, 430–31 (Tex. App.—Fort Worth 2004, pet. denied) (holding evidence legally insufficient to support trial court's endangerment finding under section 161.001(1)(D)); *In re T.H.*, 131 S.W.3d 598, 603–04 (Tex. App.— Texarkana 2004, pet. denied) (holding evidence legally insufficient to support trial court's finding as to "knowingly" element of subsection 161.001(1)(D)); *N.R.*, 101 S.W.3d at 775–76 (explaining that to support subsection (D) finding, evidence must show that parent was aware of the potential for danger to the child in such an environment and disregarded that risk); *In re D.T.*, 34 S.W.3d 625, 632–33

17

(Tex. App.—Fort Worth 2000, pet. denied) (holding evidence legally insufficient to support subsection (D) ground for termination). Likewise, viewing the evidence in the light most favorable to the judgment, assuming that the trial court as the finder of fact resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, *see J.P.B.*, 180 S.W.3d at 573, no evidence exists that Father engaged in conduct or knowingly placed the girls with persons who engaged in conduct that endangered their physical or emotional well-being as required to authorize termination of a parent's rights under section 161.001(1)(E). *See Walker*, 251 S.W.3d at 566–67; *K.W.*, 138 S.W.3d at 432 (holding evidence legally insufficient to support endangering conduct finding); *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting scienter is required to support finding under subsection (E) that parent knowingly placed children with a person who engaged in endangering conduct).

Having held that the evidence is legally insufficient to support the section 161.001(1)(D) and (E) findings, we need not conduct a factual sufficiency analysis on the section 161.001(1)(D) and (E) findings. We sustain Father's first and second issues.

## B. Section 161.001(1)(L)

In his third issue, Father argues that there is no evidence to support the trial court's finding under section 161.001(1)(L) that he had been convicted of

18

one of the offenses listed under subsection (L), involving death or serious injury to a child. The Department concedes that the evidence is legally insufficient to support the trial court's section 161.001(1)(L) finding. We agree and sustain Father's third issue.

## C. Section 161.001(1)(Q)

In his fourth issue, Father argues that there was no evidence or insufficient evidence to support the trial court's finding under section 161.001(1)(Q). Texas Family Code section 161.001(1)(Q) states that

> [t]he court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> (Q) knowingly engaged in criminal conduct that has resulted in the parent's:
>
> (i) conviction of an offense; and
>
> (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]

Tex. Fam. Code Ann. § 161.001(1)(Q) (West 2008). Father was convicted of the offense of intoxication manslaughter; he is serving a thirty-year sentence for this offense. In challenging the legal and factual sufficiency of the evidence to support the section 161.001(1)(Q) ground for terminating his parental rights, Father argues that the evidence fails to show that he *knowingly* engaged in the criminal conduct—intoxication manslaughter—that resulted in his conviction and confinement.

Accordingly, the issue before us is whether the evidence establishes by clear and convincing evidence, as required by subsection (Q), that Father "*knowingly*" engaged in the criminal conduct that resulted in his conviction of and confinement for intoxication manslaughter. *See id.* Under Texas Penal Code section 49.08(a), a person commits the offense of intoxication manslaughter if the person operates a motor vehicle in a public place and is intoxicated and by reason of that intoxication causes the death of another by accident or mistake. Tex. Penal Code Ann. § 49.08(a) (West 2011). Intoxication manslaughter requires no proof of a culpable mental state; it is, by statute, a strict-liability crime. *Wooten v. State*, 267 S.W.3d 289, 305 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Reidweg v. State*, 981 S.W.2d 399, 406 (Tex. App.—San Antonio 1998, pet. ref'd) (op. on reh'g) (same). Thus, Father's mere conviction for the strict-liability offense of intoxication manslaughter cannot automatically supply the knowing element required by subsection (Q).

We have located no published case law addressing the "knowingly" element of subsection (Q). *Cf. Smith v. Dep't of Family & Protective Servs.*, No. 01-07-00648-CV, 2008 WL 2465795, at *6 (Tex. App.—Houston [1st Dist.] June 19, 2008, no pet.) (mem. op.) (rejecting father's argument that "knowingly" as used in section 161.001(1)(Q) meant father had to know that he was the father of the child). Nor does the family code define "knowingly." We therefore turn to the rules of statutory construction to determine what the term "knowingly" as used in subsection 161.001(1)(Q) means and, consequently, what it required the

20

Department to prove by clear and convincing evidence in order establish section 161.001(1)(Q) grounds for terminating Father's parental rights.

In construing statutes, our primary objective is to give effect to the legislature's intent. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) (citing *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009)). And we are to rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context or the plain meaning leads to absurd results. Tex. Gov't Code Ann. § 311.011 (West 2005); *see also Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999) (explaining that "it is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent"). Courts should give effect to "every sentence, clause, and word of a statute so that no part thereof [will] be rendered superfluous." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (quoting *Spence v. Fenchler*, 107 Tex. 443, 457, 180 S.W. 597, 601 (1915)). Additionally, we strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21. By the rule of strict construction, "it is not meant that the statute shall be stintingly or even narrowly construed, but it means that everything shall be excluded from its operation which does not clearly come within the scope of the language used." Norman J. Singer & J.D. Shambie Singer, 3 *Statutes and Statutory Construction*, § 58:2, at 110 (7th ed. 2008); *see*

21

*Jennings v. WallBuilder Presentations, Inc.*, 378 S.W.3d 519, 523 (Tex. App.—Fort Worth 2012, no pet.).

Given its common and ordinary meaning, the term "knowingly" means "in a knowing manner" and "with awareness, deliberateness or intention." *See* Webster's Third New Int'l Dictionary 1252 (2002); *accord Hardy v. State*, 102 S.W.3d 123, 131–32 (Tex. 2003) (utilizing definition of "cash" set forth in *Webster's Third New Int'l Dictionary* as providing ordinary meaning of the word "cash" as used in statute). At least one case has used a similar definition of knowingly in connection with examining the sufficiency of the evidence to support termination on (D) and (E) grounds. *See In re D.P.*, 96 S.W.3d 333, 336 (Tex. App.—Amarillo 2001, no pet.). The penal code defines knowingly as

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann. § 6.03 (West 2011) (also defining "intentionally," "recklessly," and "criminal negligence"). The Texas Supreme Court has explained that the culpability continuum, from the lowest to the highest mental states, includes gross negligence, knowingly, willful, and then intentional. *See Luna v. N. Star Dodge Sales, Inc.*, 667 S.W.2d 115, 118 (Tex. 1984). The dictionary definitions of "knowingly," the penal code definition of "knowingly," and the supreme court's explanation of where "knowingly" falls on the culpability

continuum make it clear that, whatever "knowingly" means, it means more than mere negligence. Keeping in mind that we must strictly construe involuntary termination statutes in favor of parents and that under the principle of strict construction we are to exclude from subsection (Q)'s operation all conduct that does not clearly come within the scope of the language used—that language being "knowingly engaged in criminal conduct"—we hold that to establish that a parent "knowingly engaged in criminal conduct" as set forth in subsection (Q), the Department must prove more than mere negligence. *Accord E.N.C.*, 2012 WL 4840710, at *7 (refusing to hold that parent's commission of any offense that could lead to imprisonment automatically constitutes endangerment because "[o]ur nation's Constitution forbids such a far-reaching interpretation of our parental rights termination statutes").

The Department offered very little evidence concerning Father's intoxication manslaughter conviction other than the judgment for that conviction. Father testified that, prior to the date of the car accident forming the basis of the intoxication manslaughter charges against him, he did not drink hard liquor and did not drink on a regular basis. Father said that on the day of the accident, he consumed a full bottle of Seagrams 7. Father testified that he was not intoxicated at the time of the accident and that his conduct was accidental; "[i]t was not premeditated[,] and it wasn't foreseen." This is the only evidence in the record bearing on the issue of whether Father "knowingly engaged in criminal

23

conduct" as required to support a termination finding under section 161.001(1)(Q).

On appeal, the Department argues nonetheless that "[t]he trial court was entitled to find that Appellant knew he was drunk after drinking a full bottle of Seagrams 7," and that "the trial court was entitled to find that Appellant knowingly drove while intoxicated." But the Department did not elicit evidence supporting these contentions at the termination trial. No evidence exists concerning the size of the bottle of Seagrams 7 that Father drank—an airplane mini bottle or a one gallon bottle. No evidence exists regarding the period of time over which Father consumed the Seagrams 7 on the day of the accident or how long before the accident he consumed it. No evidence exists concerning whether Father vomited or slept after drinking the Seagrams 7 and before the accident. No evidence exists concerning the time of day or night that the accident occurred. No evidence exists as to whether Father was speeding, ran a red light, drove the wrong way on a one-way street, or committed any type of traffic offense in connection with the accident. No evidence exists of Father's driving conduct at all. No evidence exists of Father's blood-alcohol level. In short, viewing the evidence in the light most favorable to the judgment, assuming that the trial court as the finder of fact resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, the record contains no evidence from which the trial court could have formed a firm conviction or belief

24

that Father "*knowingly* [as opposed to negligently] engaged in criminal conduct"—the strict-liability offense of intoxication manslaughter—that resulted in his conviction. *See id.* (holding evidence legally insufficient to support termination when the court of appeals essentially affirmed the trial court's finding on the basis of supposition by inferring a worst-case scenario not supported by facts in the record).

Because we hold that the evidence is legally insufficient to show that Father knowingly engaged in criminal conduct under subsection (Q), we need not address Father's other challenges to the subsection (Q) finding. Additionally, having held that the evidence is legally insufficient to support the section 161.001(1)(Q)(i) finding, we need not conduct a factual sufficiency analysis on the section 161.001(1)(Q)(ii) finding. We sustain Father's fourth issue.

## V. CONSERVATORSHIP

Father did not raise an issue in this appeal challenging the appointment of the Department as the managing conservator of the girls. When the Department is appointed as managing conservator solely based on family code section 161.207 as a consequence of the trial court's termination order, a parent's challenge to the Department's conservatorship appointment is automatically subsumed within the parent's appeal of the termination order, and a separate issue on appeal challenging the Department's conservatorship is not required. *See* Tex. Fam. Code Ann. § 161.207 (West 2008) (requiring trial court to appoint managing conservator when it terminates parental rights); *In re D.N.C.*, 252

25

S.W.3d 317, 319 (Tex. 2008) (holding parent's challenge to Department's conservatorship appointment was subsumed in appeal of parental-rights termination order when Department was appointed conservator solely based on section 161.207 as a result of termination order). When, however, a trial court's termination judgment appoints the Department as managing conservator pursuant to section 153.131, and the trial court has made the specific findings that section 153.131 requires—that appointment of the parent or parents as managing conservator(s) would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development—then a parent appealing the termination judgment must specifically challenge the trial court's section 153.131 findings and the appointment of the Department as conservator. *See* Tex. Fam. Code Ann. § 153.131 (West 2008) (authorizing appointment of Department as nonparent managing conservator if the trial court makes certain findings); *J.A.J.*, 243 S.W.3d at 615–17 (holding parent must raise appellate issue specifically challenging trial court's section 153.131 findings or challenging appointment of Department as conservator under section 153.131 because such a challenge is not subsumed within the parent's challenge to the termination order).

In the present case, the trial court made section 153.131 findings. The order terminating Father's rights contains a finding that "[t]he Court finds that the appointment of either parent as Managing Conservator would not be in the best interest of the children because the appointment would significantly impair the

26

children's physical health or emotional development." As previously mentioned, Father did not challenge these findings. Accordingly, because there is no independent challenge to this statutory basis for the appointment of the Department as managing conservator of the girls, we affirm the Department's appointment per section 153.131 as managing conservator. *See J.A.J.*, 243 S.W.3d at 617 (explaining procedure to be followed by a parent, the Department, and the trial court when a judgment terminating parental rights is reversed by the court of appeals but the Department's conservatorship pursuant to section 153.131 is affirmed).

## VI. DISPOSITION

Having sustained Father's four issues, we reverse the trial court's judgment terminating Father's parental rights to Claire, Chelsea, and Stephanie and render judgment denying the Department's petition to terminate Father's parental rights to Claire, Chelsea, and Stephanie. Because Father's challenge to the Department's section 153.131 conservatorship was not subsumed within his appeal of the termination order and was not challenged on appeal, we affirm the trial court's appointment of the Department as the managing conservator of Claire, Chelsea, and Stephanie.

SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: December 21, 2012

27