

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00197-CV

IN THE INTEREST OF L.S.,
A CHILD

----------

FROM THE 233RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 233-537224-13

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Appellant Mother appeals the

termination of her parental rights to her daughter L.S. (Leah)[3] following a bench

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use a pseudonym for the child, who is a minor. *See* Tex. R. App. P. 9.8(b)(2).

trial. In two issues, Mother challenges the sufficiency of the evidence to support the trial court's best-interest finding and the trial court's denial of her motion to extend the mandatory dismissal deadline found in Texas Family Code section 263.401(a). *See* Tex. Fam. Code Ann. § 263.401(a) (West Supp. 2016). We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Because Mother challenges the sufficiency of the evidence to support the trial court's best-interest finding, we set forth a summary of the evidence.

### A. The Referrals

The Department of Family and Protective Services (Department) received three referrals for neglectful supervision of Leah by Mother. The first referral, which was received on May 31, 2015, alleged that law enforcement was called to Mother's home due to a domestic disturbance between Mother and an ex-boyfriend and that Leah was present in the home when the domestic violence occurred. Mother's ex-boyfriend told law enforcement that Mother had been using heroin on a daily basis for the past year and that she was "high" and "out of it" all the time, including while supervising Leah. Mother's ex-boyfriend provided law enforcement with a video of drug paraphernalia in plain view on Mother's bed. Law enforcement found a box of needles and some heroin in the home.

According to the June 1, 2015 referral, seven-year-old Leah was outside waiting for Father[4] while Mother and an unidentified male were "passed out" inside the home. The referral also stated Mother had been seen smoking heroin. A free-base crack pipe, a box full of needles, and foil filled with heroin were observed in the home. A needle filled with heroin was found on Mother's bed, and a needle was seen on the couch while Leah was running around the living room playing. The referral further stated that the electricity had been out in the home for three or four days and that the food in the refrigerator had spoiled.

The third referral, which was received on June 14, 2015, alleged that Mother "had moved somebody into the home and had been involved in a relationship with [him] in order to obtain drugs." A video was obtained showing a pipe, a needle filled with heroin, and a box of heroin paraphernalia; in the background of the video, Mother can be heard crying.

### B. The Investigation

Jessie Mae Davis, the CPS investigator for this case, testified that she spoke to the secretary at Leah's school and learned that Leah was often picked up late and that Mother had to be called to come pick up Leah. The secretary said that Mother was usually "passed out" and that the school had to call one of Leah's emergency contacts to either go wake up Mother or to pick up Leah.

---

[4]Father, who was in jail at the time of the termination trial, executed an irrevocable affidavit of relinquishment. Based on this affidavit, the trial court terminated Father's parental rights to Leah. Father did not appeal.

3

Davis met with Leah at her school on June 1, 2015. Leah told Davis that there was no food in the home, that Mother did not have any money to buy food, and that Mother had been in and out of jail.

Four days later, Davis went to Mother's home and noticed that the outside of the home was dirty, that there were broken windows covered with cardboard, and that there were buckets of water and caps to syringes in the driveway. Inside the home, there was very little food, the kitchen sink did not work and was covered with plastic, there were dishes piled everywhere, and there were gnats flying all around the kitchen. Davis testified that the home was not suitable for a seven-year-old child. Mother submitted to an oral drug swab and tested positive for heroin and methamphetamine but denied any drug use. Mother provided Davis with the name of an ex-boyfriend to care for Leah, and Leah was placed in his care. This initial placement lasted only nineteen days because Mother's ex-boyfriend could not afford to pay for daycare. The Department did not return Leah to Mother when the initial placement failed because at that time, Mother tested positive for "high levels" of heroin, methamphetamine, and amphetamines. Leah was placed in foster care.

### C. The Offer of Family-Based Safety Services (FBSS)

Dinoi Abraham, an FBSS worker, testified that he visited with Mother at her home on June 26, 2015. Abraham noticed that there were piles of trash outside the house, in front of the garage, on the driveway, and inside the house and that it "was stinky." Abraham testified that the home was not appropriate for small

4

children.  Abraham went through his assessment with Mother, who said that she had used heroin in the past one or two days.  Mother admitted that she had a drug problem and said that she was planning to go to a doctor for a prescription to help curb her craving for drugs.  During the assessment, Mother smoked and kept running back and forth to her bedroom.  Based on Mother's behavior, Abraham believed that Mother was under the influence of drugs.  Abraham explained FBSS to Mother and offered her a substance-abuse program, parenting skills, and other services; Mother stated that she did not want to work any services.

### D.  The Department's Case and Mother's Lack of Communication

After Mother declined FBSS, the Department filed its original petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship.  The Department made a service plan for Mother, and Amy Granados, the caseworker, attempted to set up a time with Mother to go over the service plan.  Granados testified that she had sent letters to Mother's home, had called, had texted, and had attempted twice to meet with Mother at her home to discuss the service plan, as well as visitation with Leah, but there was little to no communication from Mother other than Mother's text in early August 2015 canceling an appointment.  Granados testified that Mother did not engage in any services and did not visit with Leah during the pendency of the case.

5

Granados did not have any reason to believe that Mother could provide a safe or drug-free home for Leah. Granados, on behalf of the Department, asked the trial court to terminate Mother's parental rights to Leah so that she could be adopted by Maternal Grandmother, with whom Leah had been living since January 2016 and with whom she had lived during the first five years of her life. Granados testified that Maternal Grandmother desired to adopt Leah and that Leah desired to be adopted by Maternal Grandmother.

### E. Mother's Testimony

Mother testified about her communications with the Department. She said that from July 31 through September 15, she had spoken with her investigator four or five times but was not told that she had been assigned a caseworker. Mother said that her investigator told her that she would have to complete a number of tasks before she would be allowed visitation with Leah.[5]

On September 16, 2015, Mother moved in with a friend on Cherry Lane and ceased contact with CPS regarding visitation or services. Mother later moved to Fletcher Avenue, then lived in her car, and later went to jail for two weeks on a charge of felony drug possession. Mother testified that she did not contact CPS to let them know her updated contact information because she did not have a telephone number.

---

[5]Granados testified that the Department does not make visitation contingent upon a parent's progress on her service plan.

6

At the time of the trial, Mother had been living with her boyfriend's parents for a few days and intended for their residence to become her permanent residence, though she did not know the address. Mother said that her boyfriend was in rehab and did not have a release date. Mother testified that it would be appropriate for her boyfriend to be around Leah once he returned from rehab because Mother and her boyfriend were "both trying to completely rehabilitate together."

Mother explained that she had last used heroin "around" one month before the termination trial; prior to that, Mother had used heroin every day. Mother had last used methamphetamine approximately four months prior to the termination trial. Mother stated that she had never used drugs around Leah because her sister and Maternal Grandmother had watched Leah when Mother used drugs. Mother claimed that she had detoxed off all drugs on her own without going to rehab in order to put herself in a position to show that she could provide a safe and appropriate home for Leah. Mother was willing to submit to a drug test and believed that she would pass.

Mother took full responsibility for the termination trial due to her irresponsible parenting and drug use. But Mother also testified that she had never let her drug use affect her parenting. When asked whether Leah's placement in the Department's care might be an indication that Mother's drug use had affected her parenting, Mother responded, "Maybe a small one."

7

Mother believed that she, rather than Maternal Grandmother, was in a better position to provide a stable and appropriate environment for Leah. Mother explained that she could care for Leah because she (Mother) was completely rehabilitated, had a safe place to live, and had a job as a cocktail waitress with steady income and because she was Leah's mother and would not grow tired of her and abandon her like Maternal Grandmother had allegedly done to Mother.

Mother asked the trial court not to terminate her parental rights to Leah and not to give any rights to Maternal Grandmother. In the alternative, Mother asked the trial court to extend the mandatory dismissal deadline to give her the opportunity to begin working services for the purpose of attempting to have Leah returned to her. Mother believed that an extension of the dismissal deadline would be in Leah's best interest.

### F. Documents in the Record[6]

The child's service plan demonstrates that Leah was developmentally on target, that she did not have any special physical needs, and that she was seeing a therapist because she had attachment issues. The family service plan states,

> As Of: 7/31/2015
>
> . . . [Mother] has been non[-]cooperative with the investigator and has not shown any initiative to remain in contact with [Leah] since she has been in foster care. . . .

---

[6]When the record is silent, as here, the trial court may be presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement in the record that it has done so. *See In re J.E.H.*, 384 S.W.3d 864, 869–70 (Tex. App.—San Antonio 2012, no pet.).

8

[Mother] does not currently have a positive support network in her life. [Mother] does not appear to be willing or able to protect [Leah] from other people who may inflict serious harm on her. . . .

As Of: 12/13/2015

. . . .

. . . [Mother] has not been able to provide a stable home environment for [Leah] while she was in her care, and this is a concern because [Leah] needs a stable, loving, and consistent lifestyle.

. . . .

[Mother] does not appear to have the appropriate protective capacities for [Leah]. In the past[,] she has let strangers in and out of the home and has also used drugs while [Leah] was in the home. [Mother] does not appear to understand that [Leah] is only a child and needs protection from harm.

## G. The Outcome

At the conclusion of the evidence, the trial court, acting as the factfinder, found by clear and convincing evidence that Mother had violated section 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code and that termination of Mother's parental rights to Leah was in Leah's best interest and signed a judgment terminating Mother's parental rights to Leah. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O) (West Supp. 2016). Mother then perfected this appeal.

9

### III. Sufficient Evidence Supports the Best-Interest Finding

In her second issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.[7]

### A. Burden of Proof and Standards of Review

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment.

---

[7]Although Mother's second issue is framed solely as a factual sufficiency challenge, she includes citations supporting a challenge to the legal sufficiency of the evidence within her best-interest analysis. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

*Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

In evaluating the evidence for factual sufficiency in parental termination cases, we are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

11

## B. Factors for Determining Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is

12

in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

### C. *Holley* Factors Weigh in Favor of Termination

Mother argues that the trial court did not have adequate information from Leah's attorney ad litem in order to make the determination that termination of Mother's parental rights to Leah was in Leah's best interest.[8] As detailed above, we review the *entire record* to determine the child's best interest. *See A.B.*, 437 S.W.3d at 500.

With regard to Leah's desires, Granados testified that Leah desired to be adopted by Maternal Grandmother. Due to Leah's young age, however, she did not possess sufficient maturity to express an opinion regarding a parental preference. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.). The trial court was entitled to find that this factor weighed neither in favor of nor against termination of Mother's parental rights to Leah.

As for the emotional and physical needs of Leah now and in the future, her basic needs include food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and

---

[8]Mother cites no authority, and we have found none, for her implied proposition that the trial court must base its best-interest determination solely on evidence presented by an attorney ad litem.

13

recreational activities appropriate to her age. Leah told Davis that Mother did not have money to buy food, and Davis saw very little food when she went to the home. Mother's home at the time of the removal was deemed unsuitable for Leah, and Mother did not have stable housing while Leah was in the Department's care. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

With regard to the emotional and physical danger to Leah now and in the future, the record revealed that significant harm could be inflicted on Leah by Mother due to Mother's history of drug use, her caring for Leah while under the influence of drugs, and Mother's failure to protect Leah. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

With regard to Mother's parenting abilities, Mother initially testified that she did not believe that her drug use had affected her parenting skills, but when faced with the fact that Leah had been removed from Mother's care due to her drug use, Mother admitted only that her drug use maybe had a small effect on her parenting skills. The record further revealed that Mother had been in jail twice, had exposed Leah to domestic violence, and had not visited with Leah throughout the time she was in the Department's care. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

14

The record revealed that the Department initially offered Mother FBSS and that Mother chose not to take advantage of those services. The record also demonstrated that Mother did not complete her CPS services. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

With regard to the plans for the child and the stability of the proposed placement, Mother testified that although she had been there for only a few days, she planned to make her boyfriend's parents' home her permanent address and that she was in a better position than Maternal Grandmother to provide a stable and appropriate environment for Leah. Maternal Grandmother planned to adopt Leah and had demonstrated that she could provide a safe, stable home for Leah. The trial court was entitled to find that these two factors weighed in favor of termination of Mother's parental rights to Leah.

With regard to Mother's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Mother's drug use that continued until the month before the termination trial, Mother's housing instability and inability to provide food, Mother's willingness to expose Leah to domestic violence, as well as Mother's failure to take advantage of the services that she was offered—reveals that the existing parent-child relationship between Mother and Leah is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

As for any excuse for Mother's acts or omissions, Mother testified that she had not been informed that a caseworker had been assigned to her but admitted that she had not kept in contact with the Department or informed it of her address each time she had relocated. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Leah.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and Leah was in Leah's best interest, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (holding evidence legally sufficient to support best-interest finding based on mother's lack of a safe, stable home environment; noncompliance with services; and drug use).

Similarly, reviewing all of the evidence with appropriate deference to the factfinder, we hold that the trial court had sufficient evidence before it relevant to the *Holley* factors from which it could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and Leah

16

was in Leah's best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child."). We overrule Mother's second issue.

## IV. No Abuse of Discretion by Denying the Motion to Extend the Mandatory Dismissal Deadline

In her first issue, Mother argues that the trial court abused its discretion by denying her motion to extend the mandatory dismissal deadline. Mother contends that due to the inadequacy and the incorrectness of the information given to her by the Department, she was not given the opportunity to participate in programs that would have assisted her in improving and demonstrating her parenting skills.

We review a trial court's decision to grant or deny an extension of the dismissal date under the abuse of discretion standard. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g en banc). A trial court must dismiss a suit affecting the parent-child relationship if it has not rendered a final order or granted an extension on the first Monday after the first

17

anniversary of the date the court rendered a temporary order appointing the Department as temporary managing conservator. Tex. Fam. Code Ann. § 263.401(a). The trial court may grant an extension of up to 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). The focus is on the needs of the child, whether extraordinary circumstances necessitate the child remaining in the temporary custody of the Department, and whether continuing such is in the best interest of the child. *Id.* Actions that are "considered to be the parent's fault" will generally not constitute an extraordinary circumstance. *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied).

Here, during her direct examination, Mother made an oral motion to extend the dismissal deadline so that she could begin working services.[9] Prior to her

---

[9]The record includes the following exchange regarding Mother's oral motion for an extension of the dismissal deadline:

> Q. [by Mother's attorney] Okay. Are you asking the Court at this time to extend the dismissal date in this cause of action to give you an opportunity to begin working services with CPS for the purposes of trying to reunify with your daughter?
>
> A. Absolutely.
>
> Q. Do you think that that would be appropriate?
>
> A. Absolutely.

oral motion to extend the dismissal deadline, Mother's testimony demonstrated that she had moved several times but did not keep in contact with the Department or update it regarding her address and that she had used heroin one month prior to the termination trial, knowing that Leah was in the Department's care due to Mother's drug use. Mother presented no evidence to establish that "extraordinary circumstances" necessitated Leah's remaining in the temporary managing conservatorship of the Department.[10] The trial court impliedly denied Mother's motion.

Given Mother's ten-month delay in addressing her drug addiction and her failure to keep in contact with the Department, it was entirely within the trial court's discretion to determine that Mother had failed to present any extraordinary circumstances that would necessitate an extension of the dismissal deadline. *See A.J.M.*, 375 S.W.3d at 604–05 (upholding trial court's denial of extension of dismissal deadline to incarcerated father who contended with no

Q. Do you think that that would be in the child's best interest?

A. Absolutely.

[10]Mother argues on appeal that the absence of the attorney ad litem from the termination trial constituted an extraordinary circumstance necessitating an extension of the mandatory dismissal deadline. Mother lacks standing to raise this argument. *See A.E. v. Tex. Dep't of Family & Protective Servs.*, No. 03-14-00414-CV, 2014 WL 7458731, at *5 (Tex. App.—Austin Dec. 23, 2014, no pet.) (mem. op.) (holding that father lacked standing to complain about trial court's decision to proceed when children's attorney ad litem was not present at beginning of hearing); *In re T.N.*, 142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no pet.) (holding that mother did not have standing to complain about children's attorney's performance on children's behalf or on her own behalf).

proof that his incarceration had prevented compliance with service plan); *In re D.W.*, 249 S.W.3d 625, 648 (Tex. App.—Fort Worth 2008) (en banc) (holding that because mother presented no evidence when she presented her motion for extension, she could not show that trial court had abused its discretion by denying her motion to extend the dismissal deadline), *pet. denied*, 260 S.W.3d 462 (Tex. 2008); *see also In re J.O.*, No. 07–16–00030–CV, 2016 WL 2753911, at *1 (Tex. App.—Amarillo May 9, 2016, no pet.) (mem. op.) (holding trial court did not abuse its discretion by denying mother's oral motion for extension of dismissal deadline when mother produced no evidence that extraordinary circumstances necessitated continuance). Thus, we hold that the trial court did not abuse its discretion by denying Mother's motion for extension of the mandatory dismissal deadline, and we overrule Mother's first issue.

## V. CONCLUSION

Having overruled Mother's two issues, we affirm the trial court's judgment terminating the parent-child relationship between Mother and Leah.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DELIVERED: September 8, 2016