

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00239-CV

———————————————

IN THE INTEREST OF J.B., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-679135-20

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant B.B. (Mother) appeals the termination of her parental rights to her adopted daughter J.B. (Jana),[2] who was removed at age three from Mother's care after numerous bruises were noted on Jana's body and Jana attributed the injuries to Mother. In five issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings on endangering environment, failure to complete the service plan, endangering conduct, and best interest and that she received ineffective assistance of counsel because trial counsel failed to object to unfairly prejudicial evidence. Because legally and factually sufficient evidence supports the endangering-environment, endangering-conduct,[3] and best-interest findings and because the record on direct appeal provides no explanation for trial counsel's actions, and thus Mother is not able to overcome the strong

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of an appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after the notice of appeal is filed).

[2]We use an alias to refer to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[3]We need not address the failure-to-complete-the-service-plan finding because only one predicate ground plus best interest is necessary to support a termination order. *See* Tex. R. App. P. 47.1; *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also a best-interest finding but requiring appellate court to detail analysis for appeal challenging endangering-environment or endangering-conduct findings).

presumption of reasonable assistance, we affirm the trial court's judgment terminating Mother's parental rights to Jana.

## II. Background

### A. Overview[4]

During the period from July 13, 2019, to August 28, 2019, the Texas Department of Family and Protective Services received nineteen referrals regarding life-endangering acts that Mother had allegedly perpetrated on Jana. Ultimately, the injuries that Jana presented with on August 28, 2019, led to her removal from Mother's care. Our summary of the record begins with injuries that occurred prior to that time, showing that Mother's conduct, and any environment where she was present alone with Jana, was endangering to Jana. The summary also includes testimony that is relevant to the best-interest factors.

### B. Signs of Abuse Prior to the August 2019 Removal

#### 1. The Prior Babysitter's Testimony

Iveth Robles started babysitting Jana in 2017 and babysat her for approximately six months. Robles saw injuries on Jana and took a picture of her ear because it was severely bruised. Robles said that both ears had bruising on them. When Robles pointed out the bruising to Mother, Mother said that Jana had been scratching her ear and that it had turned purple due to all the scratching. Robles also saw bruises on one

---

[4]The reporter's record totals over 2,000 pages and the clerk's record spans almost 1,000 pages. We therefore provide an overview before delving into the particulars of the voluminous record.

of Jana's legs; Mother said those bruises had occurred at another babysitter's house. On one occasion, Robles saw a red mark on Jana's face; Mother said that Jana had run into a door. Robles testified that she never saw Jana scratch or hit herself, nor did she see her bang her head against a wall or a floor.

### 2. Testimony from the Director of Buckner Children and Family Services

Cynthia Rentie, the director of Buckner Children and Family Services, testified that her organization has residential programs for single mothers and that Mother and Jana became residents of the program in February 2018.

In April 2018, a resident in an apartment adjacent to Mother's reported that she thought that Mother was abusing Jana because she heard a lot of screaming and yelling and thought that she heard Mother spank Jana. When Rentie looked into the accusations, Mother said that she did "get on to" Jana but did not spank her; Mother yelled at her "but not in an abusive situation."

In June 2018, there was a report that Jana was seen outside carrying a potty and that Mother was potty shaming Jana. Mother said that she was teaching Jana how to use the potty and having her sit on it. Rentie and Mother's therapist told Mother, "You can't do that." It was agreed that Mother would address appropriate potty-training techniques in her counseling as part of her Buckner program.

After seeing bruises on Jana at a Mother's Day event at Buckner in May 2019, one of the residents made a CPS report. When Mother learned who had made the

CPS report, Mother went and confronted that resident in her apartment. The resident called Rentie to report that Mother was in her apartment and would not leave. Rentie testified that she was concerned because Mother was upset and would not leave the resident's apartment. The resident felt unsafe because of Mother's actions and left Buckner's campus to go stay in a safe place.

On June 7, 2019, Rentie went to Buckner's campus because Mother had called the police due to being tired of people saying that she was going to hurt the moms or the kids. Mother told Rentie that she was going to give Jana to Jana's half brother's adoptive parents[5] and that she had told three residents to take their kids inside because she was unsafe. Mother called Jana's half brother's adoptive parents, and they came to the campus, as well as the police. Mother was hysterical and was highly upset. Other residents texted Rentie asking what it meant when Mother had said that she was unsafe. When Mother told the moms that she was unsafe, her behavior, according to Rentie, was irrational and unbalanced; Rentie said, "You didn't know what was going to happen." Rentie and Mother's therapist stayed with Mother until she calmed down because she was sitting in her car and they were concerned that she might harm herself.

Five days later on June 12, 2019, Rentie received a call at 2:24 a.m. that CPS had come to the campus to investigate a report that Jana had to be airlifted and that

---

[5]Jana, who was adopted by Mother, has one biological sibling—a half brother—who was adopted by another family.

her blood was on the porch. CPS wanted Rentie to know that Jana was fine and that someone was harassing Mother by making such a report. Rentie talked with Mother, and she "was pretty hysterical."

After that, Rentie said "all the different spoof calls [started] happening." Rentie explained that a couple of residents, the CPS worker and supervisor, and Rentie started receiving anonymous threatening texts. They could never figure out who was behind them, but the CPS worker thought that it might be Mother.

Rentie said that due to her concerns that Mother was unbalanced or unable to control her emotions when she was upset and due to Mother's confrontation of the resident, Rentie decided that the campus was unsafe due to Mother. So Mother was discharged from Buckner.

Rentie testified that she had seen Mother lose control or act in an irrational manner when she (1) disregarded Rentie's instruction to only text message the resident who made the May 2019 CPS report and instead did whatever she wanted to do at that time (i.e., confront the resident in person), (2) called 911 after telling the moms to take their kids inside because she was unsafe, and (3) was discharged from Buckner. Rentie said that Mother is not able to listen and think rationally and that concerned her. Rentie testified that she was also concerned about Mother's ability to deal with a crisis or a conflict. Rentie agreed that Mother needed a lot of work to overcome that in her future.

### 3. The Prior School Nurse's Testimony

Robin Johnson, formerly a school nurse at the school that Jana attended when she was approximately two years old, testified that the first time she saw an injury on Jana, it was a swollen eye that appeared to be either bruised or an allergy. Mother sent a note saying that Jana had allergies. Later, Johnson noticed that Jana had knots on her head and bruises on her arm. After Jana appeared with a bite mark on her arm, Johnson started paying closer attention. Johnson never observed Jana harming herself, and no one ever reported to Johnson that Jana was exhibiting self-harming behavior in the classroom.

Johnson called CPS on April 18, 2019, when Jana returned from a weeklong absence with bruises and marks on her back that appeared to have been caused by her being hit with a switch or some sort of object—in addition to bruises on her head, leg, and elbow.

Johnson was concerned that Jana was being physically abused. Johnson explained that the amount of injuries on Jana on that day was "far and beyond" what she would expect for a child. Johnson further testified, "And the welt marks on her back -- even if you could explain, 'Well, she got a bruise on her leg,' what's going on with her head and back? She can't injure her back. She can't get a bruise on her arm like that. To me, that's not self-injury."

When Johnson was informed by Mother's counsel that Jana had been seen by the medical director of the child abuse group at Dallas Children's Medical Center

during April to May 2019 and that he did not make a diagnosis of physical abuse, Johnson said that she disagreed with the medical director's conclusion.

## C. The Injuries that Led to the Removal and Jana's Forensic Interview Connecting Mother to the Injuries

### 1. The Center Director of the Preschool

Elese Henry, who is the center director for a child-care facility in Arlington, testified that Jana attended the center off and on during 2018 and 2019 and came to school on different occasions with what appeared to be bruises or bite marks. Henry testified about a picture that was taken on August 21, 2019, showing that Jana's ear was a red and purplish color. Henry said that Jana had arrived at the school with her ear "really discolored." Later that day, Jana's shirt flew up when she was bouncing around, and the teacher noticed a mark on Jana's back that was made of four little dots and appeared to be a bite mark. Henry said that the dots were not small enough to be a child's bite. Henry said that there was a bruise on the upper part of Jana's back and that she had a couple of little bruises next to the four dark marks; "[h]er back was bruised up."

On August 27, 2019, the day prior to Jana's last day at the preschool, Jana's teacher saw a bite mark on Jana's bottom. There were no incident reports indicating that the bite had occurred at school.

Henry said that some of the teachers who had been at the school longer than she had been there had been informed by Mother that Jana engaged in self-harming

8

behavior at home. Henry testified that she was never told by the teachers that Jana was engaging in any self-harming behavior while at the day care.

Henry testified that Jana had previously arrived at school with bruises on her face and that Mother always said that Jana had fallen. Henry said that, initially, Mother's explanation sounded plausible, "[b]ut when . . . you see bruises, back-to-back bruises, like every other day, . . . you really start to [wonder] [w]hat's going on?" Henry said that whenever Jana missed a day of school, she came back with fading bruises on her face, back, or arms. Jana told Henry on more than one occasion, "Mommy loves me. She's not trying to hurt me. She's just trying to keep the bad ladybugs away."

Henry testified that she and her staff had concerns that Jana was being physically abused. Henry said that she had made reports to CPS in 2019 and that she believed her coworkers had made some reports to CPS prior to the reports that she had made.

### 2. The Medical Director's Testimony

Dr. Jayme Coffman, the medical director of the CARE team at Cook Children's Medical Center (CCMC), testified that Jana was seen at CCMC on August 23, 2019, and on August 28, 2019. Jana was three and a half years old at the time and was seen due to concerns of child abuse.

Dr. Coffman, who was not the treating physician on either occasion but had reviewed the records (including photographs), testified that the skeletal survey

performed on August 23 showed no fractures, but Jana had several bruises on her forehead, bruises on her upper back and shoulder blades, a bruise on her left upper outer arm, bruises on her shins, a bruise on her ear, and an abrasion to her mid back. Jana said that Mother had "whooped" her because she had "peed" on the couch. Mother said that Jana was abusing herself.

Dr. Coffman reviewed records from Dallas Children's Medical Center that diagnosed Jana with ADHD, but she testified that "most children with ADHD don't hurt themselves, other than being active and falling. They're not self-injuring, self-abusive to themselves."

Although Dr. Coffman did not examine Jana, she testified that the injuries caused her concern that there was physical abuse:

> The most concerning is the ear bruise because children don't typically get bruising on their ears from falls and accidents or even self-harm. It has a fairly high sensitivity and specificity as an injury . . . for abuse.
>
> Also, the bruise on her upper arm that wasn't a bony area. It was a soft and kind of a cushioned area. And typically, you don't get bruises in soft padded areas of your body from falls. So that was concerning as well.
>
> And we didn't really have at that point a good explanation for the abrasion and bruising on the back. So anything on the trunk can be concerning as well.

Jana was seen again at CCMC on August 28, 2019, due to additional injuries. She had circular bruising on her left butt cheek and on the right side of her face; both

of which appeared to be bite marks.[6]  A new skeletal survey was performed, and it was normal, as was the basic bleeding-disorder workup.  Although Dr. Murillo—who examined Jana on August 23—did not make a diagnosis of child abuse, the doctor who examined Jana on August 28 diagnosed the bruises as physical abuse of a child.

Dr. Coffman saw some partial videos of Jana being examined at CCMC on August 23 and said that she was squirmy.  But Dr. Coffman did not see anything indicating that CCMC's personnel had injured Jana; Dr. Coffman said that there were no objects in the exam room that would have caused the particular shape of bruising that Jana had on August 28.

It was Dr. Coffman's expert opinion that Jana was the victim of child abuse. Dr. Coffman stated that although Jana's injuries were not life threatening, the fact that there were multiple injuries over time reflects a pattern of behavior that had been inflicted on Jana.  Dr. Coffman explained,

> And so it's not just the physical pain that it causes, but it's also the emotional abuse that goes with that.  Which every episode is an adverse event in the child's life, which then, when we look at adverse childhood events, . . . the more you have, the more likely you are to have long-term health issues and [an] earlier death.

But Dr. Coffman testified that since Jana was five years old at the time of the trial, she was past the highest risk of death from abuse.

---

[6]Dr. Coffman said that she sees bite marks in child abuse and that "it's typically when the caregiver is very frustrated and acts out in almost an animalistic kind of response."

Dr. Coffman testified that if a caregiver has untreated mental-health issues, that places a child at more risk for child abuse. Dr. Coffman said that if mental-health issues are treated appropriately, "that reduces the risk." Dr. Coffman explained that untreated mental illness, depending on the type, "makes it difficult for the caregiver to cope with behaviors in a child and [to] react appropriately[] [a]nd may also inhibit [the caregiver's] ability to care, so it increases the risk of neglect as well."

### 3. The Forensic Interview

Jana underwent a forensic interview at Alliance for Children on August 27, 2019, when she was three years old. During the interview,[7] Jana said that Mother had given her a whooping for peeing on herself. Jana explained that Mother had given the whooping with her hand and that Mother had hit her forehead. Jana stated that Mother had thrown her with her hand and had kicked her in the leg with her feet. Jana said that Mother had also whipped her with a purple spoon. Later when identifying the parts on a doll, Jana said that Mother and her teacher had scratched her back with their hands. Jana said that Mother had scratched her back because Jana told her no; when asked why she had told Mother "no," Jana said that she had wanted Mother to stop hitting and scratching her back. Jana also described getting an "ouchie" at CCMC; she said that she had hit her face on the table and that was why

---

[7]The video of the forensic interview was admitted into evidence and played for the trial court.

she had a Band-Aid on her cheek.  She also said that someone at CCMC had closed her ears when her ear was hurting.

### 4. The Child Protective Investigations Program Director's Testimony

Leanne Marks, who served as a program director with Child Protective Investigations (CPI) in the summer of 2019, testified that Jana's case was transferred from Dallas County to CPI's Crimes Against Children Unit in July 2019 after Mother had moved from Dallas County to Tarrant County.  A supervisor brought the case to Marks's attention because there were fifteen intakes from July 13 to July 24.

Marks said that they had performed case mapping on this case and described the process as follows:

> Case mapping is where we lay out everything in the case.  We open it from beginning to end.  We look at the mother's history as a child.  We look at her history prior to these intakes that have come in.  But we look for a continuing course of conduct[;] we look for trends.  We look for anything that we may not be seeing now.
>
> And we decided to case map [this] case because we were a fresh set of eyes.  And Dallas had this case for quite some time.  They had some repeated intakes, and we knew nothing.  So we were the best people to come in and lay this case open with a fresh set of eyes and look at the history from beginning to end.
>
> . . . .
>
> . . . We printed every intake, every investigation report, every report that was ever typed up and put in our system on [Mother].  We printed all those out[,] and we looked at them page by page by page.[8]

_____

[8]Marks summarized the fifteen intakes:

Mother's CPS history started in April 2018 with allegations that Jana had marks, bruises, and injuries. The photos in the CPS system showed bruises to Jana's eye and face and a black mark under her eye.

When the case was transferred to Marks's unit, there was a recent incident involving an injury to Jana's face, and Mother said the incident happened at Kroger. On July 25, 2019, Mother texted a Dallas County CPS supervisor and said that she had been attacked at a Kroger because someone recognized Jana.[9] Mother texted that people were calling her "monster," taking pictures of her, and chasing her. The supervisor asked if Mother had been physically attacked, and she said that they both were and that she had called the police, who were on their way. Mother said that her back was injured and that she was trying to calm down Jana and was going to take her to the emergency room.

---

We got intakes that [Jana] was in a hot car, that she was being killed on Facebook Live, that [Mother] was waving a gun on Facebook Live, [that Jana] was dead, that [Mother] was drunk. Someone had done an intake saying that [Mother] had asked the reporter to help put [Jana] in a body bag and dispose of the body.

We got an intake saying that [Jana] was observed with swelling to her right eye. There was a bite mark on her eye. [Mother] had choked and hit [Jana]. Pictures were posted on Facebook of [Jana] having injuries, and there was blood coming from her face and her mouth, that she was on the doorstep of someone's home with fresh bruising on the right side of her face. Many more.

[9]There were references throughout the record to the publicity that this case had received.

14

When Marks spoke with Mother the following day, the story had changed: Mother said that there was a bruise on Jana's face due to her hitting her face on the car door when Mother had opened it as they were trying to get away from the mob at Kroger. Marks explained that they tried to verify the story,

> but we could not find any 911 calls. We had Arlington Police go to every Kroger. They went to ten Krogers in Arlington that [Mother] believe[d] she may have been at. There were no videos, no 911 calls there.
>
> [Mother] said [that] she had taken [Jana] to a small emergency room in Pantego. We identified which one she was talking about. They had not seen [Jana], so we were never able to find any evidence that anything ever occurred or ever happened.

A new referral came in on August 21, 2019, due to new injuries seen at the day care. A decision was made to request an order to investigate because Mother was not being very cooperative with Marks and had declined Family-Based Safety Services (FBSS). Marks said that they also needed the order to investigate so they could have Jana seen by medical professionals.

Jana was seen at CCMC for the injuries to her ear and back. A few days later, there was a new intake when the day-care workers noted what appeared to be bite marks on Jana's face and bottom.

Marks was involved in the decision to remove Jana from Mother on August 28, 2019. Marks said that she was concerned over the inconsistent statements regarding how Jana had received the injuries because "[n]one of the statements ever seemed to pan out or make sense." Marks said that the injuries always seemed to be centered

around potty training, being spanked, and Jana's being afraid that Mother was upset with her. Marks said that there was no evidence of the Kroger incident or anything else that happened to give Jana her injuries, so they had only one person that they believed was causing the injuries—Mother.

### 5.    The CPS Investigator's Testimony

Liliana Castillo, an investigator with Tarrant County CPS, testified that she reviewed the case after it was transferred from Dallas and reached out to Mother to meet with her. Castillo met with Mother on July 26, 2019, and Jana came with Mother. Jana had a bruise on her right cheek. Mother explained that Jana had sustained the bruise when she had hit her face on the door as they were running from Kroger after a lady had punched Mother and had called her a monster. Mother said that she had spoken with Arlington PD who had told her to take Jana to the emergency room, so Mother took her to the ER in Pantego. Castillo was never able to confirm the Kroger story.

On August 21, 2019, Castillo became aware that Jana had arrived at day care that day with bruises on her ear and her back. Mother had indicated that she was not willing to work with CPS, so CPS requested an order to investigate.

CPS obtained the order on August 23, 2019, and Castillo contacted Mother's attorney because she wanted Mother to bring Jana so that CPS could have her evaluated at CCMC. They went to CCMC, and Castillo saw the bruise on Jana's ear and the scratch on her back. When Castillo was in a room alone with Jana, she made

an outcry of abuse; Jana said, "My mommy hurt me." Castillo asked Jana what had happened to her back, and she said that she had "got[ten] whooped" for peeing herself. Castillo talked to Mother who said that she did not know the ear bruise was there and that she had found out about it that day; Mother said that Jana had scratched her back on the pool at Lake Livingston. Castillo observed Jana's skeletal survey and did not see her face get injured; Castillo also did not see any marks on Jana's face before she left the hospital. Jana went home with Mother and spent the weekend and the following Monday in Mother's care.

On Tuesday, August 27, 2019, CPS received a new referral from the day care stating that Jana had a Band-Aid on her cheek and a bruise on her buttocks; the day care also sent a photo. Castillo went to pick up Jana so that she could undergo a forensic interview. After Jana made outcries in the forensic interview, CPS requested a parent–child safety placement because they concluded that it was not safe for Jana to go back to Mother. Mother agreed to have Jana placed with a family friend. Mother said that Jana's bruises were caused by CCMC when the medical personnel had slammed her onto the table during her scan. Because Castillo had observed the scan, she did not find Mother's explanation to be credible.

On August 28, 2019, Castillo met with Mother and her attorney to sign the parent–child safety paperwork and asked Mother to engage in FBSS. Mother was not agreeable to FBSS. Also during this meeting, Mother changed her mind about having

Jana placed with a family friend,[10] so CPS filed a motion to remove Jana. The trial court granted the motion the same day.

After the Department took possession of Jana, they transported her to CCMC for another evaluation. Afterwards, Jana was placed in a foster home.

Castillo believed that the injuries to Jana's back, ear, bottom, and face in August 2019 were caused by Mother because Jana had been in only Mother's care, because the day care had immediately reported seeing the bruises upon her arrival, and because Jana had made the outcry about Mother. Castillo testified that she did not investigate the teachers at the day care because Mother was the one with exclusive care of Jana prior to the reports of the bruises:

> So I know that she was seen -- from the ear bruise, she was seen on Friday by the day care. And the next time they saw her is when they reported it. And the same thing happened when she was seen with the cheek and with the butt. [Mother] had [Jana] that Friday. That's when I had last seen her as well that night, and she didn't have those marks or bruises.
>
> And then she was seen on Tuesday at the day care for the first time. She did not go on Monday and on that Tuesday[,] [s]he was seen with the marks and bruises.

Castillo disposed of the investigation into Jana's injuries during August 2019 as "reason to believe" for physical abuse of Jana by Mother.

---

[10]When Jana was placed with the family friend, Mother violated the safety plan by picking up Jana from day care even though Mother was supposed to have no unsupervised contact.

## D. The Remainder of the Department's Case

### 1. Mother's Psychological Evaluations

Dr. Kalima Charway, a licensed psychologist, testified that she performed a psychological evaluation on Mother on November 9, 2019. As part of the psychological evaluation, Dr. Charway performed the Personality Assessment Inventory (PAI). Dr. Charway explained that the PAI indicated that Mother did not answer the questions in a completely forthright manner; instead, she was trying to present herself in an unrealistically positive light. The PAI indicated that Mother was satisfied with herself, that she did not experience distress, and that she had little need for changes in her behavior.

Because Dr. Charway did not have Mother's psychiatric history at the time that she performed the psychological evaluation, the trial court ordered a second evaluation, which Dr. Charway performed on October 10, 2020. Before the second evaluation, CPS sent Dr. Charway Mother's psychiatric records from various treatment facilities. Dr. Charway noted that Mother's records revealed a history of aggression and antisocial potential and that she had previously been diagnosed with Bipolar II, psychiatric disorder, general anxiety disorder, and adjustment disorder.

During the second psychological evaluation, Dr. Charway repeated the PAI and obtained results that were similar to those from the first time. Dr. Charway also performed the Minnesota Multiphasic Personality Inventory-2 on Mother. It showed that Mother had a chronic pattern of psychological maladjustment; that she was likely

immature and alienated; that she tended to manipulate others for gratification; that she is indulgent and narcissistic; that she has a grandiose conception of her own capabilities; that she may be quite aggressive with others; that she can be very impulsive and act out her problems; that she rationalizes her difficulties; that she denies responsibility for her actions; that she prefers to blame other people; and that she tends to be hostile, resentful, and irritable. It further showed that Mother is suspicious of others' actions and then blames others for her own negative frame of mind, that she views the world as a threatening place, and that she sees herself as having been unjustly blamed for others' problems and feels like she is getting a raw deal out of life. Dr. Charway summarized her findings as follows:

> Consistent with previous reports, [Mother] was guarding her responses, and she was not likely willing to disclose information about her current functioning and details[;] thus, some . . . portions should be interpreted when reading these notes because she might be underreporting and trying to purposely present herself in an unrealistically positive light.
>
> A[s] far as her significant psychiatric records, the records reveal a history of aggression[] [and] antisocial potential -- these are based on her records[.] . . . [H]er previous diagnoses[ included] Bipolar II, psychiatric disorder, general anxiety disorder, [and] adjustment disorder.
>
> However, [Mother] denied any current psychiatric symptoms associated with depressive, anxious moods like stress disorder[.]

Dr. Charway concluded that Mother continued to meet the criteria for Bipolar II disorder. Dr. Charway testified that even though she had diagnosed Mother with Bipolar II Disorder in full remission, Mother could still require monitoring or medication management to stay on top of it so that there were no episodes.

20

Dr. Charway could not say with confidence that all the history and diagnoses would not impact Mother's ability to be a safe parent.

### 2. Mother's Counseling[11]

### a. Director of Merit Family Services

Carol Blackmon, the director of Merit Family Services, testified that Mother became a counseling client in October or November 2019. Blackmon testified that Merit's no-show policy is that after the second missed appointment, they let CPS know that the client is pending unsuccessful discharge.

Mother did not show for her first appointment with M.L. Gladney and then switched to Bronwyn Lucas. Mother had a no-show in January 2020 and a couple of other no-shows, so she was unsuccessfully discharged.

Mother returned to Merit for counseling in May 2020 and attended counseling weekly or every other week from May 2020 to September 2020. Working on parenting and mental health were added to Mother's goals and objectives in fall 2020 when Mother switched to Melissa Montero because her prior counselor had left Merit. Mother did not schedule an appointment in October 2020, and she canceled the November 2020 appointment less than twenty-four hours prior, so it was counted as a no-show. Merit then terminated Mother's counseling because of excessive no-shows.

---

[11]Although we dispose of the appeal without reaching the service-plan-compliance finding, which was based on Mother's failure to complete counseling, we include a summary of testimony about Mother's counseling sessions because such testimony is relevant to the endangerment findings and the best-interest finding.

21

Mother was discharged unsuccessfully from her counseling. Blackmon testified that the notes indicated that Mother did not make progress in her therapy.

### b. Testimony from One of Mother's Psychologists

Dr. Marta Otero, a clinical psychologist, testified that she saw Mother for counseling nine times between December 7, 2020, and February 19, 2021, and that they had a close-out session on April 15, 2021. Dr. Otero reviewed the October 10, 2020 psychological evaluation, which stated that Mother might portray herself in an unrealistic positive light, and Dr. Otero saw this displayed during her sessions with Mother. Dr. Otero noted that Mother tended to blame others for her situation and that she was a covert narcissist. Dr. Otero opined that Mother needed to be honest with herself and others.

Dr. Otero described Mother's therapy as complicated because Mother's stories were inconsistent. Dr. Otero explained that the inconsistencies related to Mother's past: how many children she had birthed, her relationship with her adoptive parents, and her relationships with past romantic partners. As examples of the inconsistencies, Dr. Otero testified that Mother said she had a boyfriend, but "boyfriend went to husband, then she had been married twice, then she went from . . . having one kid to four or five kids and no abuse by [her adoptive father] and then sexual abuse and physical abuse [by her adoptive father]." When Dr. Otero brought the inconsistencies to Mother's attention, Mother gave explanations, but they did not make sense to Dr. Otero. Dr. Otero took issue with Mother's many inconsistencies and

22

defensiveness, said that it was concerning that Mother's truths kept changing because she was not being forthright, and concluded that therapy had not gone far enough.

Dr. Otero said that there were goals for what Mother wanted for her future as a mother and what she wanted for Jana, but there were not sufficient goals for Mother's mental-health treatment. Dr. Otero explained that Mother was not able to fully comprehend that she may have had something to do with some of the problems in her life.

Dr. Otero gave Mother the Child Abuse Potential Inventory, which showed that Mother was defensive when she took it and that she scored as having high probability for potentially abusing a child. Dr. Otero testified that a person who comes from an abusive upbringing has a statistically higher chance of abusing or neglecting a child. Dr. Otero's opinion during the closing session in April 2021[12] was that Mother needed more counseling before she could safely parent Jana.

### 3. CPS Supervisor's Testimony

Kenyatti Tricksey, a case management oversight specialist with CPS, testified that she was the supervisor of the conservatorship unit when Jana's case was received from Dallas in August 2019. Tricksey said that Mother's service plan required her to actively engage in parenting classes, a psychological evaluation, a psychiatric

---

[12]The sessions with Dr. Otero ended because Mother had initiated services with a private provider.

evaluation, and individual counseling;[13] to follow through with recommendations from the psychological and psychiatric evaluations; and to maintain her support system.

Tricksey testified about a family group conference when Mother became visibly upset with the conversation that was taking place over the phone; she was yelling at the person on the phone, staring into space, foaming at the mouth, and clenching her fists. Tricksey said that Mother's physical demeanor was "very concerning" and "could be intimidating and frightening to individuals who are not familiar with . . . what's going on with her." Tricksey testified that she was concerned that someone on the phone could upset Mother to the point that she did not care who was observing her or her actions. Tricksey said, "[Mother] was acting that way in front of . . . [people] who are considered strangers, so I can only imagine how she would act in front of people [who] she cared about."

Tricksey also testified about an incident when she saw Jana playing with a doll. Tricksey noticed that Jana was pretending to be the doll's mother and that Jana immediately started disciplining her doll for peeing on herself. Tricksey testified that

---

[13]Specifically with regard to counseling, Mother's service plan required her to attend and actively engage in Individual Counseling with[] Merit Family Services. The focus will include addressing the issues surrounding the reason for removal and parenting education. This service will also address issues involving relationship concerns and any past abuse and/or neglect. [Mother] is expected to consistently engage in counseling[] until successfully discharged by the therapist and CPS.

Jana "was yelling at the doll, shaking the doll, and asking the doll, 'Why do you keep peeing on yourself? Every time I change your clothes, you always pee-pee on yourself.' She was putting the doll . . . on her shoulder, and she was patting the doll's bottom, shaking the doll, [and] turning the doll upside down." Tricksey said that Jana hit the doll and that the behavior "just came out of nowhere" as they had just been admiring the doll. Tricksey opined that Jana's behavior was consistent with the outcries that she had made during the investigation stage because Jana had said that Mother had hit her when she peed on herself.

With regard to visits, Tricksey testified that in December 2019, Mother started canceling or rescheduling her visits, and there was a period of time where the caseworker did not have any contact with Mother. By February 2020, the goal had changed from family reunification to having the relative placement named as Jana's permanent managing conservator because Mother was not engaged in services. Tricksey stated that Mother was not continuing to visit with Jana and was not consistent with her individual counseling. The relative placement, however, did not want to be Jana's long-term placement.

Tricksey explained what the Department had needed to see from Mother in order for reunification. Tricksey said that because the Department had concerns that Mother was excessively disciplining Jana and being abusive to her, the Department wanted Mother to take ownership or responsibility for why Jana was in the Department's care. Tricksey explained that Mother needed to admit that she was

responsible or that she believed that something had happened and was willing to make sure it did not happen again. Mother needed to let the Department know how things would be different and how she would be able to protect Jana from coming back into care, such as by showing how she had taken the recommendations and services and was putting them to use in her daily life. Mother did not make any admissions of having abused Jana while Tricksey had the case. Tricksey understood that Mother was facing criminal charges[14] and might not want to admit what she had done, such as biting Jana on her face and on her bottom.

### 4. Mother's Testimony

The Department called Mother to testify. Mother was asked questions about her past, including about her alleged children and miscarriages, her dismissal from Central Texas College, her adoption of Jana, Jana's injuries, the Kroger incident, what she had learned from her services, and her current housing and employment status.

### a. Alleged Children and Miscarriages

Mother testified about giving birth to numerous children, including when she was living with her adoptive parents, and claimed that there were "[t]oo many to recall."[15] Mother said that she had been given Risperdal injections to drug her and

---

[14]The record includes an indictment charging Mother with "intentionally or knowingly caus[ing] bodily injury to [Jana], a child younger than 15 years of age, by striking or pushing her with the defendant's hand or kicking her with the defendant's foot or striking her with a spoon" on or about August 23, 2019.

that her adoptive father was the father of all the children.[16]  When Mother was shown the alleged children's birth certificates, which had been produced on her behalf during discovery, Mother testified that she had not been told by her prior counsel that the birth certificates were false.

Mother testified about various miscarriages that she had while the case was pending.  Mother said that her adoptive father was the father of the child that she miscarried in July or August 2020.  Mother did not know why the hospitals that she had gone to did not have records from those events.

### b.     Dismissal from Central Texas College

Mother admitted that Central Texas College, which she had attended from 2009 to 2011, had told her that she was not allowed to live on campus or attend classes there.  Mother explained that in the summer of 2011, while her friend had Mother's phone, she received harassing text messages.  The police concluded that Mother was sending the texts.  Mother said that she signed a document, which stated that she was a threat to herself and others.

---

[15]None of the children lived with Mother, and no mention was made of where the children lived.

[16]Similarly, Marks testified that Mother's accusations—that her adoptive father had sexually abused her—did not "pan out" as there were no reason-to-believe dispositions in his CPS history.

27

### c.    Adoption of Jana

Mother testified that she was a single parent and had adopted Jana. Mother described Jana as a sweet, kind, bubbling, and beautiful five year old who is very tall, very smart, and "the life of the party."

### d.    Jana's Injuries

Mother testified that when Jana was in her care, she came home from day care with injuries but never said that a teacher had hurt her or had hit her, so Mother did not report any concerns. Mother had not ever seen any injuries on Jana that she believed were anything other than self-inflicted injuries from falling down.

Mother explained that the injuries that Jana had while in her care were from falling and from Mother's not being protective when Jana had fallen or had run into the walls. Mother did not agree that Jana had bruises and marks on her all the time leading up to her removal in August 2019. When asked why Jana had said that Mother had "whooped" her, Mother believed that Jana had heard other people talking and had repeated what she had heard. Mother testified that she had never whooped Jana with a spoon; had never thrown, kicked, or bitten Jana; and had never scratched her back, hit her on her shoulder, pulled her ear, or hit her in the face. Mother said that she did not punish Jana; she had a timeout chair for discipline.

### e.    Kroger Incident

Mother gave her description of the Kroger incident. She said that during that time, there were reports at UTA about Jana's being abused, and "a lot of the students

were aware." Mother said that she and Jana had gone to Kroger "right by UTA," and some people recognized them and called Mother "a monster, a child abuser." During the incident, Mother was on the phone with a friend, who said that she was "about to call the police." Mother said that she and Jana started running out of Kroger and that Jana hit her face on the door of the car. Mother took Jana to Surepoint Clinic on South Bowen Road in Pantego, but the person at the front desk did not check them in; the clinic did not take Jana's Medicaid, and the receptionist said that Jana looked fine, as she just had a red mark.

### f.     What Mother Learned from her Services

Mother attended anger-management classes through Positive Influences in Dallas and completed first-aid and CPR training. Mother testified that she had learned to handle stressors by contacting her therapist when Mother's past was brought up during hearings; specifically, Mother mentioned the stressors that had upset her included being called a liar and being described as having fabricated stories.

With regard to counseling, Mother testified that she had been seeing Nykitia Ledbetter for therapy since October 2020 but had not provided any records to Our Community–Our Kids (OC–OK)[17] or CPS because her prior attorney advised her not to. Mother said that during the twenty-three months that the case had been pending, she had been in trauma-informed therapy; she had learned to practice self-care, to

---

[17]Tricksey explained that in March 2020, the Department transitioned to privatized conservatorship services in this region, and those services are provided by OC–OK, which is also called Our Community–Our Kids.

acknowledge her feelings, and to ask appropriate questions to Jana; and she had been taking care of herself through therapy and "just being consistent." Mother testified that continuing to develop trust and continuing to work on that in therapy would put her in a better position moving forward to reach out to someone when things start going south.

Mother said that she had participated in Love and Logic Parenting, part one and part two, and had attended a class in Bedford. Prior to the removal, Mother had attended two eight-week parenting classes at Buckner Family Services. Mother said that after going through counseling and parenting classes, she could now see why the Department had removed Jana from her care.

### g. Current Housing and Employment Status

Mother testified that she lived in a house in a safe location in Dallas but was not willing to provide the location to anyone except the trial court judge. Mother testified that she had been employed since January 2020.

### 5. Permanency Specialist with OC–OK

Carmesha Sanders, a permanency specialist with OC–OK, testified that she was the caseworker on this case from its beginning in August 2019. Sanders's testimony covered the visits that she had supervised, Mother's counseling, Mother's housing, Mother's anger and tendency to be unsafe, Jana's placements, Jana's health and her needs, and the Department's recommendation for termination and plan for Jana to be adopted.

### a.    Visits

Sanders observed the visits from September 2019 through November 2020. Sanders was present for a visit with Mother and Jana on December 18, 2019.  During that visit, Jana knocked Mother's phone off its stand and kept saying, "I'm sorry.  I'm sorry, Mommy, I didn't mean to.  I'm sorry.  I'm sorry."  Later in the visit when Mother and Jana were making Christmas cookies, Jana said, "You're being nice to me now.  You're being nice."  Sanders said this heightened her attention and "was a little concerning because [Jana] had never said anything like that."  After that visit, Mother did not visit with Jana again until February 11, 2020.

During the visits that Sanders observed from September 2019 through November 2020, Mother always brought a lot of things to the visits and held parties—a spa party, a Dr. Seuss party, and a tea party.  Sanders said that Jana started to expect extravagant things during the visits and that her behavior was "a little rambunctious" if she did not get it.  Jana wanted to play with the toys in the room, but Mother always had an activity for them.  Mother recorded the visits until an observer forbid Mother from having her phone out.  Up until then, Sanders agreed that the visits were "kind of made-for-social-media moments" and said that the visits were posted to social media.

Sanders testified that Mother and Jana have a bond and that Jana loves Mother.[18] Sanders opined that Jana's bond with Mother was not a healthy one because Mother was trying to put on a show during the visits so that she could record them instead of just being herself and visiting with Jana as if no one was watching.[19] Sanders testified that she had concerns that Mother was manipulating Jana because Jana had gone back to her foster parents and had told them that Mother had told her that she could pee on herself if she wanted to and did not have to listen to them if they told her to do certain things.

After Sanders stopped observing the visits, she received reports that the visits were going fine. Sanders agreed that Mother had been nurturing and attentive during the visits. There were no reports during the visits regarding Mother's failure to demonstrate coping skills. Overall, Sanders said that with the exception of the time frame from Christmas 2019 to February 2020, Mother was "pretty consistent" with her visits "with a few no-call-no-shows scattered in between."

### b. Mother's Counseling

With regard to Mother's counseling, Sanders testified that Mother initially went to Bronwyn Lucas and then to Melissa Montero at Merit Family Services. Sanders said that she wanted Mother to address the reasons for Jana's removal and to

---

[18]The trial court noted a stipulation regarding a bond between Mother and Jana.

[19]Dr. Otero, during her testimony, noted that visitation is not a natural environment and is not a good indicator of what the parent–child relationship actually looks like outside the bounds of being supervised.

acknowledge why Jana was in care. Specifically, Sanders wanted Mother to acknowledge the bruises that Jana had sustained regardless of whether she agreed that she had caused the bruises. Sanders said that Mother's explanations for Jana's bruises were that Jana had thrown violent temper tantrums or that she (Mother) had not caused them. When Sanders asked who did, Mother never could tell her or would not tell her.[20]

Sanders also wanted Mother to address the stressors in her life and to develop coping mechanisms. Sanders opined that Mother did not make progress in her counseling with Montero because she "went in and expressed her frustrations with CPS more than she talked about why [Jana] was in care, [what] coping or stressors she was having, [and what] issues she was having with parenting." Sanders said that Mother needed to address her past trauma but that was all that she seemed to be focused on; Mother did not seem concerned that Jana had trauma as well that Mother needed to address. Sanders noted that Mother did not seem particularly concerned about Jana and her issues. Sanders felt that Mother was not being completely honest with herself and with Montero.

There were gaps in the counseling sessions, and that was concerning to Sanders. Mother was unsuccessfully discharged from Merit.

---

[20]Sanders understood that Mother had a pending criminal case and had likely been instructed not to talk about certain things.

After Mother indicated that she wanted to choose her own counselor and not go through Merit Family Services and the trial court signed an order allowing Mother to do so, Mother chose Dr. Otero. Sanders testified that even with Dr. Otero, Mother did not address the reasons for Jana's removal and did not take responsibility for what had happened to Jana. Sanders testified that Mother was not honest with Dr. Otero "about everything, her past, and her trauma, all the way up to the present."

### c. Mother's Housing

Since February 2020, Sanders had not been told where Mother was living and needed to know so that she could assess the home for safety and to make sure that there was stability. Mother claimed to be in some sort of protective custody, but Sanders did not know anything about that.

### d. Mother's Anger and Tendency to be Unsafe

Sanders was present during the family group conference call when Mother got so angry that she had spit forming in the corners of her mouth. Sanders said that it was concerning that Mother had let someone get her that upset, that the rage completely took over, and that no one in her support circle could calm her down.

Sanders noted that Mother had blamed everything that had happened to her—from her time in care until the trial—on other people. Sanders said that Mother had

not taken responsibility for her own actions and was seeking attention. Sanders opined that Mother has untreated mental-health issues.[21]

Sanders opined that Jana would not be safe if she were returned to Mother because Mother had not "addressed anything." Sanders said,

> [Mother's] behaviors over the course of this case have not changed. She's very repetitive, like I said, in her visits and the routine that they do every week. So I feel that I'm not getting a true depiction on if she's even learning . . . anything in her parenting, if she's addressing or learning anything in counseling. I'm not getting a true depiction on what she has or has not addressed since this case has been open.

Moreover, Sanders was concerned about reuniting Mother with Jana because Jana was still having potty accidents and because Mother's handling of Jana's prior potty accidents had brought Jana into the Department's care.

Sanders testified that Mother had been allowed twenty-three months, instead of the standard twelve months, to address the Department's concerns. Sanders said that Mother had been given plenty of time to address her services.

### e.    Jana's Placements

Jana stayed with Ms. D., a placement requested by Mother, from December 2019 until May 2020.[22] On May 27, 2020, when Sanders went to pick up Jana to take

---

[21]Sanders said that the concerns about Mother's untreated mental-health issues were based on Dr. Charway's report, reports from Mother's adoptive parents, the report from Central Texas College, and the concerns raised by her counselors at Merit.

[22]The record reveals that Jana was initially placed in a foster home. While Jana was there, she was taken to the CCMC emergency room on October 3, 2019, due to

her for a visit with Mother, Jana had a red mark on her forehead. Mother also saw a mark on Jana's inner arm and elbow.[23] Mother said that she did not want Jana going back to Ms. D.'s house after the visit and was insistent that she be moved to another placement that night.

So Jana was moved that night to the house of another couple that were friends with Mother. That couple had already been verbally approved as a placement after their home study was completed, and they were willing to adopt. Jana stayed with that couple from May 2020 until October 2020 when Jana started exhibiting "some pretty bad behaviors." Sanders explained that Jana had become aggressive with the couple's youngest daughter. Additionally, due to the attention that this case was receiving, the couple was concerned about their safety and their family's safety. So the couple informed CPS that they no longer wanted to be a placement.

Jana went to a foster home on October 29, 2020, and remained there until trial.

### f.    Jana's Physical and Emotional Health and her Needs

Sanders said that Jana has issues with boundaries and does not understand personal space. Additionally, she can exhibit aggressive behaviors and is "real handsy with people, hitting people." Jana had slapped Mother twice during a visit in 2020.

---

concerns that a four-year-old foster child in the same home was sexually acting out on Jana. Jana was removed from the home and placed with Ms. D.

[23]Sanders testified that she had not seen bruises on Jana while she was in care other than the red mark on her forehead and a mark on her elbow when she picked her up from Ms. D.'s house.

Sanders testified that Jana receives behavioral therapy because her behavior fluctuates. Sanders said that even though Jana was five years old, she was still having potty accidents.

Sanders noted that since Jana had been in the Department's care, she had made outcries against Mother, stating that Mother had hit her with a purple spoon, that Mother had whooped her after she had peed on herself, that Mother had poured alcohol in her eyes and in her mouth, and that there had been "several other things." Jana had not made outcries against any of the placements.

Sanders was present when Jana was hitting her doll and said, "You don't typically see children beating up on their dolls or hitting on their dolls unless they've either seen it or it's happened to them." It was concerning to Sanders because she had never seen a child play like that. Sanders said that Jana was attending play therapy because it was recommended by her behavioral health doctor in February 2020.

Sanders testified that at Jana's initial dentist visit, she had a few cavities in the back of her mouth, and her front two teeth were decayed. The dentist put caps on Jana's back teeth and pulled the decayed teeth.

Sanders testified that Jana needs a caregiver who will be patient with her and will help work with her on her behavior; who understands her past and what she has been through; and who gives her the care, nurturing, and love that she needs to thrive.

### g. The Department's Termination Recommendation and Adoption Plan

Sanders said that Jana and her half brother "absolutely love each other" and are "really bonded to each other." Sanders said that Jana's half brother's home seems like a very loving home and that Jana was familiar with the family because she had visited them before she came into the Department's care and throughout the case. Additionally, the family had provided respite care for Jana when her foster parents went out of town.

Sanders testified that Jana was not placed with her half brother's family at the time of the trial because they were receiving threats and did not want to endanger their family, but at the time of trial, they were willing to be the adoptive placement for Jana. Sanders opined that Jana's half brother's parents would be able to meet Jana's emotional needs; her needs for counseling, behavioral therapy, and play therapy and the follow-up for those; her physical and medical needs; and her educational and developmental needs.

The Department sought to have the trial court terminate Mother's parental rights to Jana.[24] Regarding the endangerment grounds, Sanders said that Mother had abused Jana over a several-year period and had not addressed it but instead had been in denial about it. Mother would not take responsibility and had blamed the bruises

---

[24]The Department noted that there was a Court-Appointed Special Advocate (CASA) on the case and that the CASA volunteer supported the Department's position.

on Jana. Sanders agreed that Jana's living in a home with Mother, who was abusing her, was an endangering condition. Sanders believed that Mother's untreated mental-health issues had contributed to Mother's endangering conduct toward Jana. Sanders opined that Mother's untreated mental-health issues had affected her ability to cope.

Sanders testified that the service-plan ground was based on the fact that Mother was not successfully discharged from counseling. Sanders said that no matter what goals Mother had set with the counselor, she had not addressed any of the Department's concerns and had not taken responsibility for Jana's coming into the Department's care.

Sanders opined that it was in Jana's best interest for Mother's parental rights to be terminated because Mother manipulates Jana and has a strong hold on Jana that is not healthy. Sanders explained that Jana's behavior was always different after she returned from a visit with Mother.[25] Sanders opined that Mother could not meet Jana's needs because Mother "doesn't really truly understand what needs behaviorally, emotionally, that [Jana] has."

Sanders asked that the Department be named as permanent managing conservator of Jana with the right to place her for adoption. Sanders said that the Department's permanency plan for Jana is adoption by Jana's half brother's family.

---

[25]The CASA volunteer's report filed on July 15, 2021, states, "Per foster mom, [Jana's] moods and behaviors seem[] to be most inconsistent and less controlled after visits with [Mother] due to confusion in what [Mother] is communicating to her."

### E. The Defense's Case

#### 1. Mother's Testimony

In its case, the defense recalled Mother to testify. During her testimony, she expounded on some of the same topics that she had previously been questioned about by the Department, including her mental health and prior pregnancies, Jana's injuries, and the visits and provided new testimony on her support system, her plans for caring for Jana, and her request for the trial court not to terminate her parental rights to Jana.

#### a. Mother's Mental Health and Prior Pregnancies

Mother did not believe that she had an unrealistic positive outlook; she said that she had to build herself up to be able to function, hold down a job, supervise others, and be a safe parent for Jana. Mother said that in order to achieve her goals, she was continuing with therapy, uplifting herself, staying calm, working, gardening, blowing bubbles, socializing with friends, and continuing to do things that she enjoys. Mother said that she is always 100% concerned about Jana and her safety; Mother said that she was not more concerned about herself than Jana. With regard to Mother's mental and emotional health at the time of trial, she said she felt okay even though it had not been easy "hearing the things that [she had] heard."

Mother said that she remembered being pregnant in elementary school and remembered giving birth but only recalled giving birth to two children. Mother believed that her prior attorney would not have submitted anything false, so Mother

40

believed that the birth certificates—which stated that Mother had given birth to triplets in 2001 when Mother was ten years old—were real.

### b.     Jana's Injuries

Mother denied that she had caused any of Jana's injuries. Mother said that the mark on Jana's face came from CCMC; she did not believe the doctor's opinion that the mark was a bite mark. Mother said that Jana was not in her care when she got the mark on her bottom that looked like a bite mark; instead, Mother said that Jana was in CPS's care on August 28 and that she was with Ms. D. on August 27.[26]

Mother testified that she had never physically disciplined Jana and had never whooped her, bit her, hit her, or pinched her ear. Mother knew that Jana had made outcries regarding Mother's whooping her, but Mother said that Jana had heard that term when people had questioned her. Mother said that when Jana had potty-training accidents, she had used a calm tone with Jana because she does not like yelling.

When asked if she had taken ownership for why Jana had come into the Department's care, Mother said, "I didn't abuse [Jana], physically abuse her or put her around anyone that hurt her. I can say that I should've been more protective when she was having her meltdowns." Mother testified that she felt like she had let Jana down because she had gone into the foster-care system. Mother conceded that she had made mistakes in parenting in the past and said that she could see that there were

_____

[26]During her deposition, Mother admitted that she had worked from home on August 26 with Jana present and that she had taken her to day care on August 27. The record further reflects that the marks were seen by the teacher on August 27.

a lot of things that she could have done differently during the case or even prior to the case to avoid being in trial.

Mother testified about things that she had learned during the case. For instance, Mother said that she had learned that she needed to nurture Jana whenever she has meltdowns or behavioral issues and that she needed to be age appropriate with Jana regarding how she talked to her, not talking like an adult. Mother said that she had very high expectations for Jana and that her expectations were higher than what were normal for a two or three year old because she did not have anyone setting expectations for her. Mother said that she had learned that she needed to get on Jana's level and to allow her to make mistakes.

### c. Visits

Mother said that during the visits, Jana did not seem to trust her. As an example, Mother explained that Jana had told her, "Well, that's not what my foster mom said[,] so I don't have to do what you say." Mother testified that she had never "lost her cool" during the visits and never had to be redirected.

### d. Support System

Mother's support group was virtually the same as it was before Jana's removal when she had injuries. Yet Mother said that with her support network around her, she could safely and effectively parent Jana and would reach out to them if things started going south.

### e. Mother's Plans to Care for Jana

Mother testified that at the last visit before the trial, Jana said that she wanted to go home and that she missed Mother. Mother said that she was ready for Jana to come home. When asked what had made Mother ready for Jana to come home, she answered, "It's just been too long without her."

Mother testified that she was salaried, was renting a three-bedroom house, and had put Jana on her health insurance. Mother had a bedroom set up for Jana and admitted a picture showing what it looked like. Mother said that if Jana were returned to her, she would contact one of her former day-care providers to have her care for her during the one day each week that Mother has to go into the office.

### f. Mother's Request Not to Terminate

Mother testified that she had the ability to be a good and safe mother to Jana and that the main thing that she wanted the trial court to know was that she wanted Jana home. Mother asked the trial court to deny the Department's petition seeking to terminate her parental rights. Mother said that it would not be in Jana's best interest because Jana wants to come home. Mother asked the trial court to give her an opportunity to make things right with Jana and believed a monitored return was in Jana's best interest.

### 2. Testimony from the Counselor that Mother Chose

Nykitia Ledbetter, a licensed professional counselor with her own practice, testified that she had been Mother's therapist since October 2020. Ledbetter said that

she was not provided CPS records because she did not have any relation to the court. Ledbetter described her role as helping Mother through her traumatic experiences.

Ledbetter said that Mother had talked about being raped by her adoptive father and had said that she had given birth to multiple children but could only recall a girl and a boy because she had been drugged. Ledbetter testified that she had asked Mother if her adoptive father had ever been around Jana, and Mother said once while in her care. Ledbetter asked Mother why she would think that was okay to expose her daughter to the person who had harmed Mother; Mother responded that she was not thinking and then admitted that she had put Jana in danger.

Ledbetter's notes from October 21, 2020, state that Mother shared some details of how and why Jana was removed. The notes reflect that Mother said, "I would never hurt her. Hell, I didn't even give her whoopings." Ledbetter agreed that Mother had not taken responsibility for any physical abuse.

Ledbetter testified that Mother's diagnosis was "major depression disorder, recurrent, moderate." Ledbetter explained that "things within [Mother's] life have caused depression that ha[d] lasted more than two weeks on a consistent behavior." Ledbetter said that Mother's treatment objectives were based around depression and trying to improve her day-to-day mood, self-esteem, and dysphoric function. Ledbetter explained that dysphoric means that "things are not within the norm." Later, Ledbetter said that dysphoric mood means "irritable with everything that's going on. Like, she's off balance with everything that's going on in her life."

44

Ledbetter said that Mother was not taking medication for depression because medication was a trigger for her as Mother had shared that "she was drugged a lot when younger and was not able to function and doesn't recall things accurately, so she does not even want to consider medication."  A June 2, 2021 therapy note stated that Mother had expressed some frustration about a suggestion that she go to a mental-health facility.  Mother opined that would be agreeing to the term "crazy" that she felt she was being labeled; she did not think that there was any reason for her to go to a mental institution because there was nothing logically wrong with her.

Ledbetter was asked to read her notes from Mother's November 18, 2020 session in which Mother shared details of her rough week:

> [Mother] made a comment of maybe allowing her daughter to stay in a nice placement so she would not have to deal with her past.
>
> When [I] asked [Mother] to explain what she meant, she stated, "I did nothing wrong, but I'm being punished for some reason and don't want my daughter to have to deal with it because of someone not liking me or doing this to me."
>
> [Mother] expressed her visit with her daughter was not the best. She shared her daughter expressed not coming home and telling her she can do what she wants.  In this moment [Mother] expressed feeling a loss of control in parenting her child.
>
> She shared not knowing what to do or say because she does not want to say the wrong thing.  She shared when she got home, she just cried for hours.

Ledbetter could not opine on when Mother's therapy would be complete; she said that Mother would be in therapy "definitely for a few more months."  Ledbetter

45

opined that the progress that Mother had made up to the time of the trial could put her in a position to safely parent Jana if the trial court sent her home.

## F.     The Ad Litem's Recommendation

Jana's attorney and guardian ad litem's closing argument to the court included the following recommendations:

> So while in general I am [for] reunification, I can't support it here. We're two years into this case. Next month it will be two full years that the child has been removed. Mom has yet to admit responsibility or admit to anything. If you don't admit to it, you can't address the subject. She presented her counselor today[;] they aren't addressing the CPS. They're just addressing her past.
>
> . . . .
>
> The child is doing well in her placement right now. And as stated in the forensic, [Jana] says her best friend[] . . . is her brother. That's where the Department wants to place her, and that's where I want the child to go.
>
> While it's true that Mom and [Jana] had good visits[,] [t]hey're supervised. They're not a real situation. And it's true that Mom loves the child and [that] the child loves Mom. Love is not everything. As the [CCMC] expert on child abuse said, just because the child says they love a parent, doesn't mean the child wasn't abused. And until the mother addresses her issues, the child is still in danger.
>
> Even if it's nonlife[-]threatening [abuse] and that nonlife[-] threatening [abuse] continues in the future, doesn't mean it's not going to . . . be traumatic for the child in the future, mentally.
>
> For the reasons of that, I'll summarize here in my closing. I feel it's in [Jana's] best interest to terminate the parental rights and give up her for adoption.

## G.    Trial Outcome

After hearing the evidence, the trial court found by clear and convincing evidence that Mother had knowingly placed or had knowingly allowed Jana to remain in conditions or surroundings that had endangered her physical or emotional well-being, had engaged in conduct or had knowingly placed Jana with persons who had engaged in conduct that had endangered her physical or emotional well-being, and had failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of Jana who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of Jana's removal from Mother under Chapter 262 for the abuse or neglect of Jana and that termination was in Jana's best interest.

## III.  Sufficiency Challenges

In her first, third, and fourth issues, Mother argues that insufficient evidence supports the trial court's endangering-environment, endangering-conduct, and best-interest findings.  We will set forth the standard of review and then analyze the endangerment findings together before proceeding to the best-interest finding.  We then conclude, based on the evidence summarized above, that legally and factually sufficient evidence supports the trial court's termination findings.

47

### A. Standards of Review

#### 1. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds that are listed in Family Code

Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Regarding Subsection 161.001(b)(1) grounds, the supreme court articulated an important qualification: if the trial court finds grounds under Subsection (b)(1)(D) or (E)—both of which involve endangering a child's physical or emotional well-being— an appellate court must review the (D) or (E) grounds on appeal because they have potential collateral consequences for other children the parent may have. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *N.G.*, 577 S.W.3d at 237 ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis."). Termination may not be based solely on the child's best interest as determined by the factfinder under Section 161.001(b)(2). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

### 2. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all

49

the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

### 3. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that

50

a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### B.     Predicate Grounds (D) and (E)

#### 1.     Applicable Law

"Endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct need not be directed at the child nor must the child actually suffer injury in order to be endangered within the statute's meaning. *J.T.G.*, 121 S.W.3d at 125.

Under (D), we examine evidence related to the child's environment to determine if that environment endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(D); *J.T.G.*, 121 S.W.3d at 125. A parent's conduct in the home can create an environment endangering a child's physical and emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Additionally, untreated mental illness can expose a child to endangerment and is a factor the court may consider. *See In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) ("This court has held that a parent's failure to take medication can create an environment or expose a child to an environment that endangers the child's emotional or physical well-being.").

Subsection (D) permits termination based on a single act or omission, and conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D); *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under (E), we ask whether evidence exists that the parent had engaged in conduct or knowingly placed the child with someone who had engaged in conduct— including acts, omissions, or failures to act—that endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.T.G.*, 121 S.W.3d at 125. Additionally, (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *J.T.G.*, 121 S.W.3d at 125.

We may conduct a consolidated review of (D) and (E) grounds when the evidence pertaining to both is interrelated, as it is here. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

### 2. Analysis

Here, the record demonstrates that Mother's conduct in the home created an environment that endangered Jana. As summarized above, Jana arrived at her babysitter's, at day care, and at preschool on multiple occasions with bruises and injuries on her after being solely in Mother's care. The babysitter and day care workers did not ever see Jana engaging in self-harming acts, and some of the injuries that Jana was seen with—a bruise on her ear and marks on her back, bottom, and cheek that appeared to be bite marks—were not of the type that could be self-

52

inflicted. After reviewing the records from CCMC, Dr. Coffman concluded that Jana's injuries were the result of child abuse. The evidence further demonstrated that the perpetrator of Jana's abuse was Mother, as shown through (1) Jana's forensic interview in which she stated that Mother had whooped her with her hand and a purple spoon, had hit her forehead, had thrown her, had kicked her, and had scratched her back and (2) Jana's statements that she made at the hospital about Mother's whooping her for peeing on the couch. Moreover, Mother was aware that her conduct created an unsafe environment for Jana and even went so far as to tell the residents at Buckner that she was unsafe and that they needed to take their children inside. At bottom, this evidence is legally and factually sufficient to support both endangerment grounds.

Mother, relying on *C.D.E.*, argues that a parent's conduct cannot be the basis for the endangering-environment ground. *See* 391 S.W.3d at 296. In *C.D.E.*, we held that the evidence was legally insufficient to terminate the parental rights of an incarcerated father, whose children were placed with their drug-using mother in a house without food or running water, when there was no proof that he was aware of the dangerous environment that his children were in and had disregarded that risk. *Id.* *C.D.E.* is thus distinguishable from the scenario we have here in which Mother was aware that she was unsafe to be around. And as set forth above, a parent's conduct can be considered as part of the endangering-environment analysis. *See J.T.G.*, 121 S.W.3d at 125.

Mother also argues that there is no evidence that the conditions of any of the residences where she lived with Jana were uninhabitable or inadequate or that there was any alcohol or substance abuse. Mother's argument piggybacks on her previous argument and disregards that the endangering-environment ground includes her conduct, not just the habitability of the residences where they lived. *See id.*

Mother next argues that her actions could not have been "knowingly" because the Department took the position at trial that Mother was acting under delusions. Mother does not point to any case in which a person with mental-health issues similar to hers was deemed unable to have the requisite intent for allowing a child to remain in an endangering environment. Instead, as set forth above, case law allows a court to consider untreated mental illness as a factor in the endangering-environment analysis. *See L.L.F.*, 2012 WL 2923291, at *15.

Mother further argues with regard to the endangering-environment ground that the only harm that Jana suffered was at day care (because Jana mentioned during her forensic interview that a teacher had scratched her back), at CCMC when she was evaluated, and when she was sexually abused in foster care. Mother argues that she had no knowledge of the teacher's harming Jana until she disclosed it in the forensic interview and that the harm at CCMC and in the foster home were situations created by the Department, not Mother. With regard to the day care, the record reveals that there were no reports of injuries to Jana while at the day care and that Jana also made an outcry regarding Mother's (not just the teacher's) scratching Jana's back. With

54

regard to any possible injuries during the medical tests performed at CCMC, Castillo testified that she was with Jana during the testing and did not see the medical personnel cause Jana any injuries and that Jana did not have a bruise on her face when she left CCMC. And with regard to the alleged sexual abuse that Jana endured while in foster care, that abuse is properly considered in the best-interest analysis and does not erase or outweigh the abuse that Jana suffered while in Mother's care. None of Mother's arguments undermine the fact that legally and factually sufficient evidence supports the endangering-environment ground. *See In re B.R.*, Nos. 01-13-00023-CV, 01-13-00024-CV, 2013 WL 3243391, at *6 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.) (mem. op.) (holding evidence sufficient to support endangering-environment ground when parents were the child's sole caretakers and child suffered multiple nonaccidental injuries).

In the section of Mother's brief that addresses the endangering-conduct ground, she contends that the Department relied on Dallas County referrals to demonstrate a course of conduct despite that all but one of the referrals were ruled out and that one was ruled "unable to determine." Mother argues that there was only one referral in Tarrant County that was ruled "reason to believe" and that this does not constitute a course of conduct. The Department responded as follows:

> [T]he reason[-]to[-]believe standard is not the standard used to substantiate termination under Subsection (E); rather, under Subsection (E)[,] the trial court is required to make a determination whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts,

55

omissions, or failures to act. *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Moreover, when circumstantial evidence implicates a parent as abusing her child and that parent is the sole caregiver for a child[,] and there is also evidence that the child did not sustain all [her] injuries at one time, there is sufficient evidence to establish a course of conduct on behalf of the parent that has endangered the child's physical and emotional well-being. *See . . . B.R., . . .* 2013 WL 3243391, at *6; *see also . . . J.P.B.*, 180 S.W.3d at 574.

We agree with the standard set out by the Department. Using that standard, the record reflects that there was sufficient evidence showing that Mother had physically abused Jana on more than one occasion.

Robles testified about the injuries she saw on Jana during the six months that she babysat her in 2017; those injuries included severe bruising on both of Jana's ears, bruises on one of Jana's legs, and a red mark on Jana's face. In April 2019, Johnson saw bruises and marks on Jana's back that looked like she had been hit with a switch or an object; Jana also had bruises on her head, leg, and elbow on that same date. In July 2019, when Castillo met with Mother and Jana, Jana had a bruise on her right cheek. Mother explained that Jana had sustained the bruise when she had hit her face on the door as they were running from Kroger, but Castillo was never able to substantiate Mother's explanation. In August 2019, Jana appeared at the child-care facility in Arlington first with bruises on her ear and bite marks on her back and several days later with what appeared to be bite marks on her bottom and a Band-Aid on her cheek that was covering a bruise that appeared to be a bite mark. The trial court was the sole judge of the witnesses' credibility and was free to believe the

testimony of Castillo and the child-care workers and to disbelieve Mother's explanations. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Although Mother points to places in the record showing that Jana engaged in self-harming and aggressive behavior while in the Department's care, it does not follow that the injuries detailed above were caused by self-harming. As Dr. Coffman explained, children do not typically get bruising on their ears from falls or self-harming. Moreover, self-harming could not explain the bite marks on Jana's back, bottom, and cheek.

Mother further argues in the endangering-conduct section of her brief that if the trial court's finding was based on the forensic interview, it is problematic because Jana was only three years old at the time of the interview, the forensic interviewer had limited experience interviewing children of that age, Jana was fidgety and wanted to leave the room and go play, and Jana's only accusation was "that she was 'whooped' for having a potty accident[] and that her mother and someone at daycare [had] scratched her back." Mother downplays the multiple accusations that Jana made during the forensic interview, including that Mother had whooped Jana with her hand and a purple spoon, had thrown her, had hit her forehead, had kicked her, and had scratched her back. To the extent that Jana's forensic interview also included an outcry against her teachers for scratching her back and against CCMC for hurting her cheek, the trial court was the sole judge of credibility and was free to believe parts of Jana's outcry and to disbelieve others.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's findings that Mother engaged in conduct or knowingly placed Jana with persons who had engaged in conduct that endangered the physical or emotional well-being of Jana and knowingly placed or knowingly allowed Jana to remain in conditions or surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *L.L.F.*, 2012 WL 2923291, at *16 (holding evidence legally and factually sufficient to support (D) and (E) findings based on, among other things, mother's untreated mental-health issues and aggressive behavior). We overrule Mother's first and third issues.

## C. Best-Interest Ground

### 1. Law

To determine whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. In making our determination, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest: (A) the child's desires; (B) the child's emotional and physical needs, now and in the future; (C) the emotional and

58

physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the child's best interest; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and (I) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 2. Analysis[27]

Mother argues that "the evidence in this case demonstrated that [she] and [Jana] had a loving bond[] and that [Mother] went above and beyond to try to attend classes and therapy to ensure [that] she had the skills and the mental and emotional strength to be an appropriate parent for [Jana]." Mother then discounts the

---

[27]Mother's best-interest argument in her brief consists of only one and a half pages; it does not mention the *Holley* factors, nor does it contain the required analysis that weighs each of the factors. We do not condone taking such shortcuts when challenging the best-interest finding.

Department's evidence, arguing that "[t]he testimony from the Department was composed of a lot of conjecture and speculation on this issue." This is not a proper best-interest analysis. Instead, we weigh each of the *Holley* factors set forth above and conclude that they weigh in favor of termination of Mother's parental rights to Jana.

### a.       Jana's Desires

With regard to Jana's desires, she did not testify at trial. According to Mother, five-year-old Jana said during the last visit before trial that she wanted to go home with Mother. The record contains a stipulation that there was a bond between Mother and Jana, and the notes from the visits showed that Jana enjoyed visiting with Mother. The trial court was entitled to find that this factor weighed against terminating Mother's parental rights to Jana.

### b.       Emotional and Physical Needs

With regard to Jana's emotional needs now and in the future, the record reflects that Jana needs a caregiver who will be patient with her and will help work with her on her behavior; who understands her past and what she has been through; and who gives her the care, nurturing, and love that she needs to thrive. Mother had not demonstrated her ability to be patient with Jana, other than during the monitored visits. Instead, the record showed that Mother had whooped and/or hit Jana when she had potty accidents and had "potty shamed" her at Buckner by having her carry a plastic potty outside. With regard to Jana's physical needs, Mother testified that she had a job and a home, but Mother had not disclosed her address to allow the

Department to evaluate the home and did not testify regarding her salary. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Jana.

### c. Emotional and Physical Dangers

With regard to the emotional and physical dangers to Jana now and in the future, the record demonstrates that Mother scored as high probability for potentially abusing a child, and Mother's support system is virtually unchanged from when the abuse occurred. Additionally, the events triggering the abuse—Jana's potty accidents—were still occurring at the time of the termination trial. Jana was thus still in danger of receiving "whoopings" that resulted in severe bruising and of being bitten by Mother. Mother had not completed counseling to address her anger issues. The ad litem had said that "until the mother addresses her issues, the child is still in danger"; Dr. Charway could not say with confidence that Mother's history of aggression and mental-health diagnoses would not impact her ability to be a safe parent; and Dr. Otero said that Mother needed more counseling before she could safely parent Jana. Only Ledbetter—Mother's trauma therapist—opined that Mother had made enough progress to safely parent Jana. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Jana.

### d. Parental Abilities

With regard to Mother's parental abilities, the record demonstrates that Mother had completed several parenting classes and that her interactions with Jana at the

weekly visits went well. But the record also demonstrated that during the visits, Mother put on a show to post on social media, and there were concerns that Mother manipulated Jana at the visits, instructing her not to obey her foster parents. Additionally, Mother's inappropriate and unacceptable disciplinary techniques— biting Jana and "whooping" her when she had potty accidents—had brought Jana into the Department's care, and Mother failed to acknowledge the abuse. Moreover, Mother had not completed counseling to address her anger and unmedicated mental-health issues. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Jana.

### e. Programs Available to Assist Mother

With regard to the programs available to assist Mother to promote Jana's best interest, the record demonstrates that Mother did not fully take advantage of the services on her plan. Mother did not visit with Jana during January 2020 and part of February 2020, and Mother did not complete her counseling services. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Jana.

### f. Plans for Jana and Stability of the Home or the Proposed Placement

With regard to the plans for Jana by the individuals seeking custody and the stability of the home or proposed placement, Mother testified that she had set up a bedroom for Jana and admitted into evidence a photograph of the alleged bedroom.

Mother said that if Jana were returned to her, she would contact a babysitter to watch her on the days when she was required to go into the office for her job. Jana had been in several foster homes during the pendency of the case, including one in which she had been sexually abused. The Department planned for Jana to be adopted by her half brother's parents. This factor weighs neither for nor against terminating Mother's parental rights to Jana.

### g. Acts or Omissions Indicating that the Parent–Child Relationship Is Improper

With regard to Mother's acts or omissions that may indicate the existing parent–child relationship is not a proper one, the analysis set forth above—which reflects that Mother physically abused Jana; that Mother did not take responsibility for the abuse, despite being the sole caretaker of Jana; and that Mother did not successfully complete counseling—reflects that the existing parent–child relationship between Mother and Jana is not a proper parent–child relationship. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Jana.

### h. Any Excuse for the Acts or Omissions

As for any excuse for the acts or omissions of the parent, Mother did not admit that she had abused Jana, but Mother admitted that she had made mistakes in parenting in the past and said that she could see that there were a lot of things that she could have done differently during the case or even prior to the case to avoid

being in trial. Mother said that she had learned that she needed to nurture Jana whenever she has meltdowns or behavioral issues; that she needed to be age appropriate with Jana regarding how she talked to her, not talking like an adult; and that she needed to get on Jana's level and to allow her to make mistakes. This factor weighs neither for nor against terminating Mother's parental rights to Jana.

### i. *Holley* Factors Weigh in Favor of Termination

Reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and Jana was in Jana's best interest, and we therefore hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination). We overrule Mother's fourth issue.

### IV. Ineffective-Assistance Challenge

In her fifth issue, Mother argues that trial counsel provided ineffective assistance to her by failing to object to evidence that "was of marginal, if any, relevance to the termination grounds" and that "was unfairly prejudicial" to Mother. Mother contends that the Department spent the majority of its case developing the issues of Mother's childhood and her past, attempting to attack her credibility and paint her as not only suffering from an untreated mental-health condition but also as

64

someone who was operating under a delusional state of mind. In her brief, Mother summarizes testimony that encompasses eight issues from her childhood and past and then argues that trial counsel should have timely objected to such testimony.

While an indigent parent's statutory right to counsel in a termination-of-parental-rights case filed by the State includes the right to effective assistance of counsel, in order to satisfy her burden of showing that trial counsel was ineffective, Mother must show both (1) that trial counsel's performance was deficient and (2) that the deficient performance by trial counsel prejudiced her case. *See In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003) ("Under *Strickland*, the defendant, to establish an ineffective assistance claim, must successfully show both prongs of the inquiry.").

With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case and must primarily focus on whether counsel performed in a "reasonably effective" manner. *Id.* at 545. In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *Id.* It is only when the conduct was so outrageous that no competent attorney would have engaged in it that the challenged conduct will constitute ineffective assistance. *Id.* We may not speculate in order to find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions. *In re F.L.H.*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio

Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

Here, we have nothing in the record and may not speculate to explain why trial counsel did not object to the complained-of testimony. Due to the silent record, we cannot say that Mother's trial counsel committed ineffective assistance with regard to failing to object to the complained-of testimony. *See In re D.I.*, No. 12-16-00159-CV, 2016 WL 6876503, at *5 (Tex. App.—Tyler Nov. 22, 2016, no pet.) (mem. op.) ("When, as here, the record fails to show why counsel did not object to the ICWA evidence, we cannot conclude that counsel's performance was deficient."); *see also In re G.H.*, No. 12-16-00327-CV, 2017 WL 2464694, at *3 (Tex. App.—Tyler June 7, 2017, pet. denied) (mem. op.) (holding that counsel was not ineffective when the record failed to show why counsel did not strike a juror, object to the Department's jury argument, provide additional witnesses, elicit testimony, or provide substantive closing argument). And because Mother has failed to establish one of the two *Strickland* prongs, we overrule Mother's fifth issue.

## V. Conclusion

Having overruled Mother's first, third, fourth, and fifth issues, which are dispositive of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to Jana.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: December 30, 2021